ZEMCO MANUFACTURING, INC.,
Appellant–Plaintiff,

v.

NAVISTAR INTERNATIONAL TRANS-
PORTATION CORP., Trayer Prod-
ucts, Inc., NBD Bank, N.A., NBD
Equipment Finance, Inc., Pecoraro
Manufacturing, Inc., and Joel R. Pe-
coraro, Appellee–Defendants.

No. 02A03–0012–CV–467.

Court of Appeals of Indiana.

Nov. 29, 2001.

Rehearing Denied Jan. 30, 2002.

Gene R. Leeuw, John M. Mead, Leeuw & Doyle, P.C., Indianapolis, IN, William D. Swift, Swift & Finlayson, Fort Wayne, IN, Attorneys for Appellant.

Robert D. Moreland, Michael L. James, Meg A. Gallmeyer, Baker & Daniels, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Zemco Manufacturing, Inc. filed a complaint against Navistar International Transportation Corp., Trayer Products, Inc., NBD Bank, N.A., NBD Equipment Leasing Corp., Pecoraro Manufacturing, Inc., and Joel R. Pecoraro (collectively referred to as the "Defendants," where appropriate) alleging that they had violated the Indiana Uniform Trade Secrets Act by misappropriating Zemco's trade secrets, and further alleging that Navistar and NBD had interfered with Zemco's contractual relations. Zemco appeals from the trial court's grant of summary judgment to the Defendants on all counts of Zemco's complaint. We affirm.

*Issues*

Zemco raises four issues for our review, which we consolidate and restate as follows:

1. Whether the trial court properly granted summary judgment to the Defendants on Zemco's misappropriation claim; and

2. Whether the trial court properly granted summary judgment to Navistar and NBD on Zemco's interference with contractual relations claims.

*Facts and Procedural History* [1]

Zemco manufactures machined parts that are primarily made from steel and aluminum, then sells its products to the truck and automobile industry. Navistar manufactures medium and heavy-duty trucks, mid-range diesel engines, school buses, and service parts. Navistar does not make all of the parts needed for the assembly of its products, but rather, buys parts from other manufacturers, including Zemco. The primary part Zemco manufactures for Navistar is the "spring shackle," which attaches suspension springs to truck frames.

The production of spring shackles involves sawing steel or aluminum bar stock to the proper sized blank and then drilling, chamfering, and deburring four precisely aligned holes and milling two slits in each blank. The specifications for spring shackles come from the customer. Zemco has developed a manufacturing process that enables it to mass produce spring shackles to precise specifications at an extremely low cost. For that reason, Zemco was the exclusive supplier of Navistar's spring shackle requirements for over twenty-five years. The thirteen drilling machines Zemco used to produce the spring shackles were custom-built in-house specifically for the manufacturing process developed by Zemco.

From 1980 until February of 1995, Joel Pecoraro, Sr. and Alan Zemen were equal shareholders in Zemco. In 1994, Pecoraro and Zemen had a dispute over control of Zemco, and ultimately, Pecoraro left the company pursuant to a Liquidation and Redemption Agreement (the "Liquidation Agreement") whereby Pecoraro sold his interest in Zemco to Zemen. Pecoraro then formed a new corporation, Pecoraro Manufacturing, Inc. ("PMI"), to conduct the same or similar business as Zemco had done. The Liquidation Agreement provided that Pecoraro could immediately begin competing with Zemco for customers and was entitled to use all of Zemco's trade secrets and proprietary information, if any, in his new business.[2] PMI constructed three drilling machines and one milling machine and purchased a band saw in

---

1. Zemco's request for oral argument is hereby denied.

2. The relevant portion of the Liquidation Agreement provides as follows:

[Pecoraro] is specifically licensed by [Zemco] to use any and all information and *trade secrets (if any)* of [Zemco], including, but not limited to, all sales detail, customer requirements, information, customer product pricing information, quality control data, new product research, manufacturing and overhead costs, direct and indirect labor costs, formulas, programs, methods, devices, techniques, processes and proprietary information of any type, acquired by [Pecoraro] in his capacity either as director, officer or employee of [Zemco] (collectively, such information is referred to as "Proprietary Information") for

such period of time as [Pecoraro] shall require.

This license shall be assignable by [Pecoraro] to [Pecoraro's] Business; provided, however, that [Pecoraro's] business may not sublicense the use of the Proprietary Information without the prior written consent of [Zemco]. The use of any Proprietary Information by any former employee of [Zemco] while in the employ of [Pecoraro's] Business shall be deemed a use within the license granted to [Pecoraro]. [Pecoraro] agrees, for himself and [his] Business and its employees, to keep (or cause to be kept) confidential all Proprietary Information, and shall not disclose, or permit any employee of [Pecoraro's] Business to disclose, any Proprietary Information to any other entity or person.
R. 35 (emphasis added).

order to manufacture spring shackles. PMI obtained a loan from NBD to fund construction of the machines, which cost approximately $300,000.00. Pursuant to the financing agreement, NBD Equipment Leasing Corp. held legal title to the machines and leased them to PMI. PMI then began soliciting customers, including Navistar.

In July of 1995, Navistar and PMI entered into a contract whereby PMI became Navistar's primary supplier of spring shackles. The contract was to be effective from August 1, 1995 through July 31, 1997. Through the end of 1996, PMI in fact supplied Navistar with spring shackles pursuant to the contract. By early 1997, however, PMI began to experience financial difficulties. Therefore, Navistar contacted Trayer Products, Inc., which company supplied other parts for Navistar, and asked Trayer to submit a quote for spring shackles. By late 1997, PMI's financial difficulties had increased, and PMI was late in producing some parts for Navistar. In January of 1998, Navistar informed Trayer that PMI had ceased business and in February of 1998, Navistar informed PMI that it intended to transition its spring shackle business to another supplier.

At a meeting with Navistar in February of 1998, Pecoraro first informed Navistar that he wanted to sell PMI. Navistar told Pecoraro that it knew of some companies that might be interested in buying PMI. Navistar requested that Trayer submit a bid to purchase the PMI drilling and milling machines, and also advised Pecoraro to sell to Trayer. On March 26, 1998, Trayer purchased PMI's machines from NBD for $300,000.00.

Prior to selling to Trayer, Pecoraro had initiated discussions with KG Manufacturing regarding the possible sale of PMI. KG made an offer to buy PMI, but negotiations broke down when Pecoraro told KG that the Navistar contract would not be part of the deal. Thereafter, Jerome Henry, a minority shareholder in KG, and Vincent Tippman, a shareholder in Zemco following Pecoraro's departure, attempted to purchase KG's rights in its offer. Two assignments were drafted: one by which KG would assign its rights to Henry, and a second by which Henry would, in turn, assign his rights to Tippman. The deal was never completed, however, and PMI was sold to Trayer as described above.

On May 11, 1998, Zemco filed a complaint against the Defendants, alleging in Count I that they had violated the Indiana Uniform Trade Secrets Act by misappropriating Zemco's "proprietary information." The complaint further alleged in Counts II and III that Navistar and NBD had interfered with Zemco's contractual relations. Navistar filed a motion for summary judgment on March 6, 2000, alleging that there was no genuine issue of material fact in that it did not misappropriate Zemco's alleged trade secrets and did not tortiously interfere with Zemco's contractual relations. NBD joined in Navistar's motion without filing a separate designation of evidence. Pecoraro and PMI likewise joined in the motion without a separate designation. Trayer filed its own motion for summary judgment alleging that it did not misappropriate Zemco's alleged trade secrets. Following a hearing, the trial court entered the following order:

This Court, having taken under advisement the Motions for Summary Judgment filed by Defendants [Navistar] and [Trayer], and having considered the arguments of counsel, and the Memoranda filed by the parties herein, as well as their respective Designation of Evidence, and having further considered the Supplemental Memoranda filed by the parties subsequent to the hearing on this matter ..., now rules as follows:

1. That as to Count I of [Zemco's] Complaint, the Court finds that there are no genuine issues of material fact, and that [Navistar] is entitled to summary judgment as a matter of law.

2. That as to Count II of [Zemco's] Complaint, the Court finds that there are no genuine issues of material fact, and that [Navistar] is entitled to summary judgment as a matter of law.

3. That as to Count III of [Zemco's] Complaint, the Court finds that there are no genuine issues of material fact, and that [Navistar] is entitled to summary judgment as a matter of law.

It is therefore ordered that the Motion for Summary Judgment heretofore filed by [Navistar] and joined in by [NBD], [PMI], and [Pecoraro] is GRANTED.

4. That as to Count I of [Zemco's] Complaint, the Court finds that there are no genuine issues of material fact, and that [Trayer] is entitled to summary judgment as a matter of law.

It is therefore ordered that the Motion for Summary Judgment of [Trayer] is GRANTED.

There is no just reason for delay. The Court, therefore, directs judgment in favor of Defendants and against [Zemco] on [Zemco's] Complaint.

R. 1259–60. Zemco now appeals. Additional fact will be provided as necessary.

### Discussion and Decision

Zemco contends that the trial court erred in granting summary judgment to each of the Defendants.

### I. Summary Judgment Standard of Review

 Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *I/N Tek v. Hitachi Ltd.,* 734 N.E.2d 584, 586 (Ind.Ct.App.2000), *trans. denied.* If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Gilman v. Hohman,* 725 N.E.2d 425, 428 (Ind.Ct.App. 2000), *trans. denied.* Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

 A trial court's grant of summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *City of Indianapolis v. Byrns,* 745 N.E.2d 312, 316 (Ind.Ct.App.2001). On appeal, we are bound by the same standard as the trial court, and we consider only those matters which were designated at the summary judgment stage. *Interstate Cold Storage v. General Motors Corp.,* 720 N.E.2d 727, 730 (Ind.Ct.App. 1999), *trans. denied.* We do not reweigh

the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Estate of Hofgesang v. Hansford,* 714 N.E.2d 1213, 1216 (Ind.Ct.App.1999). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Bernstein v. Glavin,* 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied.*

### II. Summary Judgment: Misappropriation Claims

Count I of Zemco's complaint alleged that the Defendants misappropriated Zemco's proprietary information. All of the Defendants filed or joined in motions for summary judgment on Zemco's complaint contending that they did not misappropriate any of Zemco's alleged trade secrets and further, that the information Zemco claimed as "proprietary information" did not qualify as a trade secret. The motions were granted. Zemco argues on appeal that the summary judgment was granted in error because Zemco's processes, techniques, devices, methods and programs for producing spring shackles do, in fact, constitute a trade secret. Zemco further alleges that the summary judgment was in error because the Defendants knew that Zemco had trade secrets which were embodied in the machines constructed by PMI, knew that the trade secrets could not be transferred by Pecoraro to anyone else without Zemco's written consent pursuant to the Liquidation Agreement, and cooperated in transferring the machines from PMI to Trayer.

### A. Trade Secrets

We must first determine if Zemco's alleged "proprietary information" constitutes a trade secret. If, as a matter of law, the information is not a trade secret, then the trial court properly granted summary judgment for the Defendants on Zemco's misappropriation claims because there was no protected information which could have been misappropriated. If, on the other hand, the information is a trade secret, or if there is an issue of fact regarding whether the information is a trade secret, then we must proceed to consider the issue of misappropriation.

■ A "trade secret" is defined by statute as:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind.Code § 24-2-3-2. This definition has been interpreted by our courts to mean that a protectable trade secret has four general characteristics: 1) information; 2) deriving independent economic value; 3) not generally known, or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and 4) the subject of efforts, reasonable under the circumstances, to maintain its secrecy. *Burk v. Heritage Food Serv. Equip., Inc.,* 737 N.E.2d 803, 813 (Ind.Ct.App.2000).

■ The burden of proof is on the party asserting the trade secret to show that it is included in the categories of protectable trade secret information listed in the trade secrets statute. *Amoco Prod. Co. v. Laird,* 622 N.E.2d 912, 920 (Ind. 1993). Hence, a plaintiff who seeks relief for misappropriation of trade secrets must

identify the trade secrets and carry the burden of proving that they exist. *Id.*

## B. Efforts to Maintain Secrecy, in general

The determination of whether a particular device or process is a trade secret is a fact sensitive determination. *Id.* at 916. In this case, it is Zemco's efforts to maintain secrecy that is the main contention. Navistar[3] and Trayer contended on summary judgment that there was no genuine issue of material fact regarding Zemco's trade secret status because it is undisputed that Zemco did not make a reasonable attempt to maintain the secrecy of the shackle machines. There are no cases in Indiana which address the "reasonable efforts to maintain secrecy" prong of the trade secrets definition. However, because Indiana has adopted the Uniform Trade Secrets Act, and because the Act is to "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject matter of this chapter among states enacting the provisions of [the Act]," Ind.Code § 23–2–3–1(b), we can turn to other jurisdictions which have also adopted the Uniform Act for guidance.[4]

By definition, information is a trade secret only if it is the subject of reasonable efforts to maintain its secrecy. Ind.Code § 24–2–3–2. The owner of the alleged trade secret must take reasonable, though not overly extravagant, measures to protect its secrecy. *Flotec, Inc. v. Southern Research, Inc.*, 16 F.Supp.2d 992, 1000 (S.D.Ind.1998). Absolute secrecy is not required. *Webster Eng'g & Mfg. Co., Inc. v. Francis*, 1993 WL 406025 *4 (D.Kan.1993). What is "reasonable" under

the facts of one case may be considered inadequate under the facts of another. *Elm City Cheese Co., Inc. v. Federico,* 251 Conn. 59, 752 A.2d 1037, 1050 (1999). In *Elm City Cheese Co.,* the Connecticut Supreme Court cited the following as examples of actions which may be undertaken to maintain secrecy: 1) requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; 2) posting warning or cautionary signs, or placing warnings on documents; 3) requiring visitors to sign confidentiality agreements, sign in, and shielding the process from their view; 4) segregating information; 5) using unnamed or code-named ingredients; and 6) keeping secret documents under lock. *Id.* at 1049 (citing 1 R. Milgrim, Trade Secrets (1999) § 1.04, pp. 1–178 to 1–189).

In *Flotec,* the Indiana Southern District Court denied Flotec a preliminary injunction on its complaint against SRI for misappropriation because Flotec had not used reasonable efforts to maintain the secrecy of its manufacturing and business information. Flotec manufactures oxygen regulators for medical uses. At some point, SRI approached Flotec seeking to become a supplier of component parts for Flotec's regulators. As part of the negotiations, Flotec representatives gave SRI representatives a tour of Flotec's plant, showed SRI representatives its manufacturing techniques, and gave the SRI representatives copies of its engineering drawings. Sometime after negotiations fell through, SRI undertook to develop its own competing line of regulators via reverse engineering. Flotec then filed a complaint against SRI alleging misappropriation and seeking

---

3. For purposes of this discussion, "Navistar" refers not only to Navistar, but also to NBD, Pecoraro, and PMI, as they all joined in Navistar's motion.

4. Forty-one states have adopted some version of the Uniform Trade Secrets Act. *Dicks v. Jensen,* 768 A.2d 1279, 1282 (Vt.2001).

a preliminary injunction. The court found that Flotec had failed to take reasonable steps to maintain the secrecy of its manufacturing and business information:[5]

> ... Flotec takes some substantial measures to protect the confidentiality of some of its manufacturing and business information. Flotec keeps its technical drawings in a secure and locked area. Computers used for technical drawings have access limited by passwords. The Flotec facility is protected by a burglar alarm. All employees are required to sign agreements acknowledging the confidential nature of Flotec's technical information and drawings and promising to protect that information. For at least several years before giving drawings to SRI ..., Flotec had used written confidentiality agreements with at least some of its suppliers who manufactured parts to its specifications. Flotec has also placed legends on some technical drawings labeling them as confidential.

> The basic problem for Flotec in this case is that it did not take even the most elementary steps to protect the technical drawings it provided to SRI. The drawings did not bear a legend that they were confidential. Flotec did not ever tell SRI that it considered the information confidential, let alone obtain a confidentiality agreement when it provided the information to SRI, and Flotec never sought assurances from SRI that it would keep the information confidential. There also is no indication that SRI ever gave Flotec any indication that it believed the information was confidential or that it intended to keep the informa-

tion confidential. Even after the negotiations broke down ..., Flotec never asked SRI to return the drawings. These circumstances strongly indicate that Flotec failed to take reasonable steps to maintain the secrecy of its allegedly valuable information and thus weigh heavily against the claim that Flotec is entitled to trade secret protection for any of the information it disclosed to SRI.

16 F.Supp.2d at 1004–05.

■ *Flotec* also addressed two other issues of interest to our determination herein. First, Flotec contended that, even if it had failed to take reasonable steps to protect the secrecy of its information, when SRI accepted Flotec's drawings, it had an implied duty to maintain Flotec's information in confidence. The court noted that an explicit promise of confidentiality is not necessary if the recipient of the information knew or should have known that the information was a trade secret and the owner expected the recipient to keep the information secret. *Id.* at 1006 (citing Restatement (3d) of Unfair Competition § 41(b) and *Phillips v. Frey*, 20 F.3d 623, 632 (5th Cir.1994)). In determining whether the recipient should have known that the owner considered the information to be a trade secret, the circumstances as they appeared to the recipient when the information was disclosed must be considered. *Id.* The court found that although SRI knew that Flotec had provided the drawings for a limited purpose, it could also have reasonably assumed that Flotec

---

**5.** The court also found that after Flotec sold its regulator on the market, its design was made readily available to potential competitors to inspect, copy, and improve upon, and therefore Flotec's business and manufacturing information could not qualify as a trade secret. The court then went on to discuss Flotec's measures to protect secrecy, finding that this provided an "independent basis for concluding that Flotec is unlikely to prevail on the merits of its trade secret claim" even if Flotec's information could be classified as a trade secret. 16 F.Supp.2d at 1004.

knew how to ask that information be considered confidential.

Secondly, Flotec contended that there was a widespread, although not uniform, practice in the machine shop industry to keep a customer's information confidential. The court found that to the extent that Flotec was relying on a supposed custom of the machine shop industry as its sole means of protecting the confidentiality of its information, it did not take reasonable steps to protect its alleged trade secret. *Id.* at 1007.

In *Dicks v. Jensen,* summary judgment had been granted to the former employees of an inn who were sued by their former employer for misappropriation of his customer list.[6] The Vermont Supreme Court determined that summary judgment was appropriate because the employer had not demonstrated that he made reasonable efforts to maintain the secrecy of his customer list: the employer did not identify any agreement with his former employees, written or otherwise, indicating an understanding that the customer list was confidential, and the employer did not identify any procedures or methods he took to ensure that the customer list was secure and that access to it was restricted. In fact, there was evidence that customer names were posted on a large board in an office where all employees and any visitor could see. 768 A.2d 1279, 1284–85 (Vt. 2001). In *Webster Eng'g,* the district court in Kansas held that summary judgment for defendants was appropriate on plaintiff's claims for misappropriation of customer information[7] when plaintiff did not restrict access to the information or apprise employees of the secrecy of the information. 1993 WL 406025 at *4. Summary judgment was also appropriate on plaintiff's claims for misappropriation of design and engineering data when plaintiff routinely loaned information to customers and sales representatives, despite the fact that a legend was sometimes stamped on the information. The stamp was not always used, there was no company policy that it was to be used on all information sent outside the company, and no evidence that the specific information given to defendants in this case had been stamped. *Id.*

Conversely, in *PepsiCo, Inc. v. Redmond,* the Illinois Northern District Court held that PepsiCo's efforts to maintain the secrecy of its business information were not only reasonable, they were more than was required by the Act.[8] 1996 WL 3965 at *16 (N.D.Ill.1996). PepsiCo provided confidential information only to those employees with an actual need to know, it regularly marked information "private and confidential," it required all personnel with access to confidential information to execute non-disclosure agreements, and at meetings where confidential information was disclosed, it was emphasized to attendees that the information was confidential. And in *Trandes Corp. v. Guy F. Atkinson Co.,* the Fourth Circuit upheld a jury verdict for the plaintiff upon finding that the plaintiff made it difficult for others to acquire copies of its software through proper means by taking steps to ensure that its employees would not disclose or improperly use its computer programs, licensing only two complete versions of the software and extracting promises from both recipi-

---

6. Vermont also has adopted a statute based upon the Uniform Trade Secrets Act. 9 V.S.A. §§ 4601–4609. The Vermont definition of a "trade secret" is identical to Indiana's. 9 V.S.A. § 4601(3).

7. The definition of "trade secret" in Kansas is also identical to Indiana's. K.S.A. § 60–3320(4).

8. Illinois' definition of "trade secret" is substantially similar to Indiana's. 765 Ill. Comp. Stat. Ann. § 1065/2(d).

ents that they would not copy or transfer the program or use the program for any purpose other than its intended purpose, and using a system of passwords to prevent unauthorized access to both the in-house and licensed versions of the software. 996 F.2d 655, 664 (4th Cir.1993), *cert. denied*, 510 U.S. 965, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993). Thus, the court held that the jury reasonably could have concluded that the plaintiff undertook reasonable efforts to maintain the secrecy of its software,[9] despite advertising the software and giving a company a demonstration disk in contemplation of entering into a licensing agreement.

From these cases, it can be seen that no one action or series of actions will necessarily mean that the proponent of the trade secret has made the minimum reasonable effort to maintain the secrecy of its information. However, although this is a highly fact-specific inquiry, summary judgment may nonetheless be appropriate under the facts of a given case.

C. Zemco's Efforts to Maintain Secrecy

■ The designated evidence in this case shows the following evidence relevant to Zemco's efforts to maintain the secrecy of its alleged proprietary information: the shackle machines were located on the third floor of Zemco's facility and were not visible through outside windows. R. 836. There were signs posted in the facility prohibiting access by unauthorized personnel. R. 184, 836. Employee handbooks stated that no equipment or prints were to leave the building, and employees were required to sign the handbook stating that they had received, read, and understood the contents of the handbook. R. 184, 191. Signs posted by the time clocks reminded employees of the sophistication of the ma-

chines and that no information regarding the machines was to leave the facility. R. 187. The doors in the facility were locked, and there was an alarm system for the building that eventually included surveillance cameras. R. 184–85. The facility was not open to the general public. R. 836. Zemen stated in his affidavit opposing summary judgment that it was customary in the industry that customers and vendors who received confidential information would maintain its confidentiality. R. 836.

However, Zemco had no confidentiality agreements with its employees. R. 191–92. Customers occasionally toured the facility and were not asked to sign confidentiality agreements. R. 189. In particular, Navistar employees toured Zemco's facility but were not asked to sign confidentiality agreements, were not told that the shackle machines they were viewing were secret, and were not asked not to disclose what they had seen. R. 148. Trayer employees were also given a tour of the facility, and, as with Navistar employees, they were not asked to sign confidentiality agreements, were not told that the machines embodied trade secrets, and were not told not to disclose any information about Zemco's shackle machines. R. 291–92, 314–16, 424. Trayer employees were on the floor and observed the machines for approximately ten to fifteen minutes, although they were not running at the time. R. 292.

Vincent Tippman, who became a shareholder in Zemco after Pecoraro was bought out, testified at a deposition that there is no particular secret to making a shackle, rather, the secret lies in being able to make a shackle quickly, efficiently, and accurately. R. 205. Although none of the designated evidence specifically states

---

9. The Fourth Circuit was applying Maryland law to reach its conclusion in *Trandes*. The relevant portion of the Maryland definition of a trade secret is identical to Indiana's. Md. Code Ann. § 11–1201(e)(2).

this, it seems that the "secret" to making the shackles efficiently is evident on the face of the custom-built machines: Zemen stated in his affidavit that he saw the PMI machines after they had been transferred to Trayer and they "appeared to have adopted" the confidential information Zemco now claims was misappropriated from their own machines. R. 837.

██ Obviously, Navistar knew or should have known over the course of dealing with Zemco for twenty-five years that Zemco had gone to considerable lengths to refine the process of making shackles. However, if Zemco did not take any steps to protect the information from Navistar or to inform Navistar that it considered its processes confidential, Navistar was under no duty to itself protect the information. To the extent that Zemco relied upon a "custom in the industry" that vendors and customers would protect confidential information, *Flotec* demonstrates that this is insufficient. *See* 16 F.Supp.2d at 1007. As for Pecoraro and PMI, Pecoraro testified that in the years he was involved with Zemco no specific measures were taken to maintain secrecy with regard to the shackle machines. R. 244–45. The Liquidation Agreement upon which Zemco relies heavily merely recites that Pecoraro will keep Zemco's trade secrets, *if any*, confidential. R. 35. The Liquidation Agreement itself is not sufficient to demonstrate that Zemco does, in fact, have trade secrets that Pe-

coraro was required, by his previous relationship with Zemco, to protect.[10]

Although Zemco took some measures within its own company and with its own employees to protect the information contained in its shackle machines, it did very little, if anything at all, to protect the information from outside sources. Under these circumstances, the trial court could have found as a matter of law that Zemco had not taken reasonable steps to maintain the secrecy of its proprietary information, and therefore the information did not constitute a trade secret protected by the Trade Secrets Act. *See Flotec,* 16 F.Supp.2d at 1004–05 (holding that although Flotec took substantial measures to protect its information in general, it did not take any measures to protect the information from the entity it accused of misappropriating the information). The trial court did not err in granting summary judgment to the various defendants on Zemco's claims of misappropriation because there was no protectable trade secret.

### III. Summary Judgment: Interference with Contractual Relations

Count II of Zemco's complaint alleged that Navistar induced Pecoraro to breach the Liquidation Agreement, damaging Zemco by allowing its proprietary information to be disclosed to Trayer. Count III alleged that Navistar and NBD induced Pecoraro and PMI to breach an agreement to sell PMI to KG Manufacturing, damag-

---

10. Zemco raises as a separate issue in its "Statement of the Issues" the question of whether summary judgment for Pecoraro and PMI was appropriate when Pecoraro and PMI did not join in Navistar's motion for summary judgment until the week of the summary judgment hearing and did not independently designate any evidence to the trial court to support summary judgment in their favor. The evidence designated by Navistar and Trayer was sufficient to sustain a summary judgment for Pecoraro and PMI even without a separate

designation. Moreover, Trial Rule 56 provides that "[w]hen any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." Ind. T.R. 56(B). Thus, Pecoraro and PMI were not even required to file a motion to join in Navistar's motion in order to have summary judgment entered for them if summary judgment was otherwise appropriate.

ing Zemco. Navistar filed a motion for summary judgment on these counts, as well, which motion was granted.

### A. Interference with Contractual Relations

■ To state a claim for interference with contractual relations, the plaintiff must allege: 1) the existence of a valid and enforceable contract; 2) the defendant's knowledge of the existence of the contract; 3) the defendant's intentional inducement of breach of the contract; 4) the absence of justification; and 5) damages resulting from the defendant's wrongful inducement of the breach. *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000).

### B. Count II: Breach of Liquidation Agreement

■ Zemco's complaint includes a claim for interference with the contractual relation between Zemco and Pecoraro by Navistar.[11] Zemco's allegations against Navistar are stated as follows:

28. Zemco had a valid, enforceable contract with Pecoraro that restricted the ability of Pecoraro or his business, PMI, to assign or disclose Zemco's Proprietary Information.

29. Navistar and NBD knew of the limitations of the assignability and disclosure of the Proprietary Information.

30. Navistar and NBD wilfully [sic] and maliciously induced Pecoraro and PMI to breach the Agreement by disclosing Zemco's Proprietary

Information to Trayer without Zemco's consent for the expressed [sic] purpose of getting the shackle business out of Fort Wayne.

31. As a result of Navistar's and NBD's inducing Pecoraro and PMI to breach the Agreement, Zemco has been damaged.

R. 27. Thus, the complaint appears to be grounded in the premise that Zemco owned trade secrets which were misappropriated when PMI transferred its machines to Trayer, causing damage to Zemco. Because we have held herein that Zemco had no protectable trade secrets, we also hold that there was no damage to Zemco from the transfer. Moreover, Zemco has wholly failed to designate any evidence which would raise an issue of fact as to the other required elements.

■ Even if the complaint could be read to be independent of whether or not Zemco possessed trade secrets which were compromised by the transaction between PMI and Trayer, Zemco's complaint must fail. The "valid and enforceable contract" which forms the basis for this claim is the Liquidation Agreement between Zemco and Pecoraro. Zemco alleges that Navistar knew of the existence of the Liquidation Agreement, but the only evidence cited to support this claim is that at some point during litigation, attorneys for Navistar referred to the Agreement during depositions. This does not lead to the conclusion that Navistar knew of the Liquidation Agreement when the transfer of machines was made. There is no evidence that Navistar "willfully and maliciously"

---

11. Although Zemco makes some allegations in Count II of its complaint regarding NBD, its prayer for relief is for judgment against Navistar only. Zemco does, however, argue in its appellate brief that NBD also interfered with its contractual relations by being involved in the PMI Trayer transaction. There is no evidence in the record which would suggest that NBD had a role in the transaction other than as the title holder to the machines in question. To the extent that Zemco's complaint can be read to make a claim against NBD, the trial court did not err in granting summary judgment to NBD on this count.

induced Pecoraro and PMI to sell to Trayer and breach the Liquidation Agreement.[12] Navistar did tell Pecoraro that it knew of some companies that might be interested in PMI when Pecoraro indicated an interest in selling. Navistar also asked Trayer to submit a bid, and advised Pecoraro to sell to Trayer. However, there are no allegations, and no evidence to support such allegations, that Navistar induced Pecoraro to sell the business in the first instance, nor that Pecoraro was required to abide by Navistar's advice once Pecoraro decided to sell. Pecoraro indicated that he would like to sell PMI and he could have sold to any company he chose. The fact that he chose to sell to Trayer does not indicate improper inducement by Navistar.

As for the element of justification, the following factors are considered in determining whether a defendant's conduct is justified: 1) the nature of the defendant's conduct; 2) the defendant's motive; 3) the interests of the plaintiff with which the defendant's conduct interferes; 4) the interests sought to be advanced by the defendant; 5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; 6) the proximity or remoteness of the defendant's conduct to the interference; and 7) the relations between the parties. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind.1994) (quoting Restatement (2nd) of Torts § 767 (1977)). The weight to be given to each consideration may differ from case to case, but the overriding question is whether the defendant's conduct has been fair and reasonable under the circumstances. *Id.* (citing Restatement (2nd) of Torts § 767, cmt. j). In this case, Zemco had already lost Navistar's business. There is no evidence to suggest that if PMI had sold its machines to another company not endorsed by Navistar or had merely closed its doors without selling its equipment, Navistar would have turned to Zemco to again supply its shackle needs. Pecoraro indicated to Navistar that PMI was unable to meet its demand for product, and that he wished to sell the business. Navistar had an interest in continuing to receive the parts it needed for its business, and it did not unduly interfere with Zemco's interests in assuring that it would continue to have an adequate supply at a reasonable cost.

Any breach of the Liquidation Agreement was accomplished by Pecoraro alone. Zemco has failed to raise an issue of fact as to at least one of the elements of this interference claim. The trial court properly granted summary judgment to Navistar on Count II of Zemco's complaint.

### C. Count III: Breach of KG's Offer to Purchase

Finally, Zemco contends that Navistar interfered with a proposed transaction between PMI and KG. In this instance, there is no valid and enforceable contract, and even if there was, there is no contract to which Zemco is a party and therefore no damage to Zemco from any breach. Thus, summary judgment was appropriate on this interference claim, as well.

KG made a proposal to purchase PMI for $1 and to hire Pecoraro as a Sales

---

12. Zemco alleged in its complaint, and also alleged on numerous occasions in its appellate brief, that Navistar's willful misconduct is evidenced by testimony that it wanted to "get the shackle business out of Fort Wayne." The fact of the matter is, Navistar is entitled to do business with whomever it chooses. The mere fact that Navistar chose to discontinue its relationship with Zemco, and then found that PMI, as successor supplier, was unable to meet its production requirements does not mean that Navistar engaged in any prohibited conduct.

Manager. When negotiations fell through, Henry, a KG shareholder, and Tippman, a Zemco shareholder, attempted to buy PMI by arranging for an assignment of KG's rights to Henry, who would in turn assign his rights to Tippman. The two assignments were actually drawn up, and Tippman testified that Henry informed him that the President of KG had executed the assignment from KG to Henry and that it was a "done deal." However, the assignment from KG as it appears in the record, although signed, has a large "X" through the entire document, and the following handwritten notations on the bottom: "1. Consideration never rec'd. 2. Never approved by directors. 3. Never delivered to J. Henry." R. 1118. Moreover, Tippman never received an assignment from Henry. Thus, there was no valid and enforceable contract on which to premise this claim. Further, Zemco was never a part of the deal, and therefore, even if there was a valid and enforceable contract on which to base this interference claim, Zemco could not prove any damages from a breach. The trial court did not err in granting summary judgment to Navistar on Count III of Zemco's complaint.[13]

### Conclusion

The trial court properly granted summary judgment to the defendants on Zemco's misappropriation claim because there is no genuine issue of material fact regarding the nature of the "proprietary information" that Zemco claims to be a trade secret: Zemco did not make reasonable efforts under the circumstances to maintain the secrecy of its "proprietary information," and therefore, the information is not properly classified as a trade secret.

If there is no trade secret, there can be no misappropriation. Moreover, the trial court did not err in granting summary judgment to Navistar and NBD on the interference with contractual relations claims, because Zemco failed to produce an issue of fact regarding at least one of the elements of its claims. Therefore, the judgment of the trial court is affirmed.

Affirmed.

BAKER, J., and FRIEDLANDER, J., concur.

---

13. Again, as with Count II, Zemco alleges wrongdoing on NBD's part, but merely attempts to bootstrap NBD culpability onto Navistar's alleged wrongdoing without any specific allegations against NBD. *See* Brief of Appellant at 52 ("Navistar, and therefore NBD, argued only the first element....."). Because there are no specific allegations of NBD's involvement in any alleged interference, the trial court properly granted summary judgment to NBD on this claim, as well.