**M.K. PLASTICS CORPORATION,**
**Appellant–Plaintiff,**

v.

**Anthony J. ROSSI, Appellee–Defendant.**

No. 49A05–0507–CV–370.

Court of Appeals of Indiana.

Dec. 12, 2005.

Alastair J. Warr, Marc T. Quigley, Krieg DeVault LLP, Indianapolis, for Appellant.

Lynne D. Lidke, Robert L. Browning, A. Jack Finklea, Scopelitis, Garvin, Light & Hanson, Indianapolis, for Appellee.

**1.** Ind.Code § 24–2–3–2 *et seq.*

## OPINION

BAKER, Judge.

Appellant-plaintiff M.K. Plastics Corporation (M.K. Plastics) appeals from the trial court's denial of its motion for preliminary injunction. Specifically, M.K. Plastics contends that the trial court erred in concluding that M.K. Plastics does not have protectible trade secrets under the Indiana Uniform Trade Secrets Act[1] (IUTSA) and that Rossi's actions did not constitute misappropriation of trade secrets under the IUTSA. Concluding that the trial court properly denied the motion for preliminary injunction, we affirm.

### FACTS [2]

M.K. Plastics is a Canadian corporation with its principal place of business in Montreal. It is engaged in the business of manufacturing, designing, and selling laboratory exhaust fans. The co-owners of M.K. Plastics are Minel Kupferberg, also known as Mel Cooper, and Robert Jeffrey Kupferberg, also known as Jeff Roberts (Roberts).

Rossi has two engineering degrees and has worked in the industrial heating, ventilating, and air conditioning industry in some capacity since 1977. From approximately 1994 to March 1999, Rossi worked as an independent manufacturer's representative of M.K. Plastics while employed by Indiana Steam and Process.

Beginning in March 1999, Rossi began working directly with M.K. Plastics to sell its fans exclusively. M.K. Plastics contracted with Rossi to market its equipment, to establish manufacturer representatives across the United States, and to promote its products. Roberts agreed to

**2.** We heard oral argument in this case on November 17, 2005, in Indianapolis. We thank counsel for their able presentations.

give Rossi the title of Vice President of Sales and Marketing for the United States so that Rossi would have more authority in the sales field. Rossi operated largely autonomously and M.K. Plastics had very little control over the performance of his sales and marketing responsibilities. M.K. Plastics paid Rossi sales commissions, an annual bonus, and a monthly salary, though it withheld no taxes, and it provided him with health insurance benefits and paid for all of his business and office expenses.

During Rossi's tenure at M.K. Plastics, he had access to a "significant amount," Appellant's Br. p. 4, of the company's sensitive information by attending high-level meetings, helping to develop a corporate "master plan," *id.* p. 5, creating memoranda that described product characteristics and applications, reading research and development work reports and design use and testing information on prototypes, and reviewing manufacturing drawings for laboratory exhaust fans and AutoCAD [3] drawings posted on the computer system by the company's engineers. Rossi also gathered and stored data—including information about the company's business, financial, and technical operations, the Maximizer program, and the V–Fan program—on three company computers.

The Maximizer program contained a database of contact information gathered by Rossi for manufacturer representatives, consulting engineers, and other business contacts within the industry. Rossi also used the program to keep track of representatives and forecast their sales. Following the termination of the relationship between Rossi and M.K. Plastics, Rossi provided the company with all information that was in the database, retaining only a copy of the contact information in the Maximizer. There is some confusion as to whether M.K. Plastics requested the password for the program, but Rossi contends that Roberts already had the password because he created the version of the software used by Rossi. M.K. Plastics denies that it had the program's password. Appellee's Br. P. 8–9.

The V–Fan program is the overall general database that M.K. Plastics uses to run its business, containing, among other things, the following information: inventory, prices and costs of each product, sales figures and forecast information, customer information, inventory, and research and development of projects. Appellee's Br. P. 10. According to Rossi, the software program was accessible to everyone within the company except for employees who worked in the factory. V–Fan is not generally password-protected, and Rossi notes that he only needed a password if he entered the program via the Internet to access the company's server. Roberts agrees that it was part of Rossi's job and appropriate for him to regularly download information contained in V–Fan to his personal computer. Rossi was chiefly interested in using the software to track representative sales activity. According to Rossi, he did not know that the software had an engineering database and did not ever access any such database.

### A. Rossi Leaves M.K. Plastics

On July 21, 2003, Rossi gave notice of his intent to end his affiliation with M.K. Plastics. Rossi's last day with M.K. Plastics was on July 31, 2003, on which date the company requested that he attend a meeting in Montreal. At the meeting, M.K. Plastics asked Rossi to sign a release

---

**3.** AutoCAD is computer-aided drawing software for two- and three-dimensional design and drafting. *Wikipedia, the free encyclope-* *dia, AutoCAD, at* http://en.wikipedia.org/wiki/Autocad (last visited November 17, 2005).

agreement containing confidentiality and non-disclosure language. Rossi refused to sign the document.

Roberts had instructed Rossi to bring a Sony laptop and a computer projector to the Montreal meeting. He wanted the Sony laptop because it contained all of the M.K. Plastics information currently being used by Rossi. Prior to the meeting, Rossi copied onto the Sony laptop all of the M.K. Plastics information that was on the other two computers that Rossi used for M.K. Plastics business. The hard drives of those other two computers were then erased—with Roberts's permission, according to Rossi—but Rossi did not erase any information from the Sony laptop computer. In addition to the laptop, Rossi also sent five large boxes of documents and equipment to the Montreal meeting containing everything he believed was significant for the company to have prior to his departure.

At the meeting, Rossi gave M.K. Plastics the Sony laptop, the projector, and various pending reports and orders. Rossi also answered all of Roberts's questions and reviewed information with Roberts regarding miscellaneous pending matters.

Following the meeting, during September and November 2003, Rossi sent several more shipments of large boxes to M.K. Plastics. The boxes included, among other things, miscellaneous files, CD backup disks, the other two computers Rossi had been using, a printer, office phone, digital camera, and scanner. M.K. Plastics complained in October 2003 that Rossi still had unauthorized possession of company property. According to Rossi, there was some delay in returning all of the property to M.K. Plastics because he had been traveling and was not at his house to package the rest of the documents and property. No one at M.K. Plastics ever followed up with Rossi regarding specific missing documents, existing projects, or independent manufacturer representatives with whom Rossi was working.

M.K. Plastics became concerned when it realized that Rossi had erased or reformatted the hard drives of the two computers he had returned to the company. As noted above, Rossi explained that all of the data on those computers had been transferred to the Sony laptop and that the erasing of the hard drives was done with Roberts's permission. According to M.K. Plastics, Rossi had access to the company's engineering plans, representative files containing model numbers, performance data, and sales prices for the company's products. Rossi denies ever accessing the company's engineering database.

*B. Rossi's Employment at Greenheck*

On July 21, 2003, the day on which Rossi gave notice to M.K. Plastics, according to M.K. Plastics, Rossi signed an employment agreement with Greenheck Corporation (Greenheck), a competitor of M.K. Plastics. The employment agreement stated that Rossi would receive substantial cash payments when he brought to market a product to compete with M.K. Plastics. According to Rossi, however, he only discussed potential employment with Greenheck prior to giving notice to M.K. Plastics, and "intentionally avoided or stopped any conversation regarding M.K. Plastics" with Greenheck. Appellee's Br. p. 17.

Rossi testified that he specifically informed Greenheck that his expertise was in sales and marketing and that if Greenheck needed a designer or engineer, he was not the appropriate person to hire. Rossi also quarrels with M.K. Plastics' assertion that he gathered information from the company to take with him and provide to Greenheck. He also testified that he did not share any proprietary information

of M.K. Plastics with Greenheck. Moreover, Rossi avers that he did not do any work for Greenheck until after his association with M.K. Plastics had ended.

According to M.K. Plastics, one of Rossi's responsibilities at Greenheck was to oversee the development of the Vektor fan. M.K. Plastics avers that Rossi gave Greenheck engineers a "handwritten sketch of an exhaust fan nozzle with a wind band design and a binder with Auto–Cad drawings of M.K. Plastics' exhaust fan nozzle and wind band dimensions." Appellant's Br. p. 7. After Rossi joined Greenheck, it produced a Vektor model containing, according to M.K. Plastics, certain unique engineering features of a product—the AXCL fan—developed by M.K. Plastics that was still in research and development.[4] Greenheck filed patent applications showing the use of a double wind band and vacuum seals, both of which, allegedly, were technical features known to Rossi while at M.K. Plastics. Greenheck listed Rossi as a participant in the design and an inventor of the Vektor fan on the patent applications.

According to Rossi, however, M.K. Plastics has not actually analyzed the Vektor fan to determine what M.K. Plastics elements might be included. Moreover, M.K. Plastics admits that there may be unique differences and that it has not seen the manufacturing characteristics drawing of the Vektor. Rossi further notes that the Vektor fan elements pointed out by M.K. Plastics as unique to the company—the double windband, the design, and the vacuum seal—are all either available in the public domain or patented by another unrelated company. Rossi also points out that if, indeed, Greenheck gained proprietary information of M.K. Plastics, it could easily have come from other sources, namely, people who tour M.K. Plastics, consulting engineers, and detailed information found on the company's website.

Rossi also notes that while he interacted with M.K. Plastics' engineering department to help with the marketability of certain product features, he had no access to drawings or designs for products under development. Additionally, as a general rule, Rossi neither requested nor was given manufacturing information. Moreover, Rossi had no access to the locked engineering computer in which M.K. Plastics engineers placed technical drawings and related research.

Michael Glen Seliger is Greenheck's senior product development engineer and was hired in March 2003—approximately five months before Rossi was employed by Greenheck—to develop the Vektor fan. Seliger testified that he does not know of any information that came from M.K. Plastics that was involved in the research and development or that in any way led to the design of the Vektor fan. Rossi brought sales and marketing expertise to Greenheck, and provided Seliger with "a hierarchy of what is important for a product's success in the lab exhaust market." Appellee's Br. p. 19. Seliger believes that Rossi helped with the development of the Vektor fan by contributing his expertise regarding the type of product that would be successful in the market. Seliger denies that Rossi ever discussed any confidential ideas or information of M.K. Plastics with him. Indeed, Seliger claims to have no knowledge of what M.K. Plastics is doing in the research and development of laboratory exhaust fans.

According to Rossi, the only information he provided to Seliger regarding M.K. Plastics was a three-ring sales binder

---

4. M.K. Plastics offered no documentation, e.g., engineering drawings, to prove to the trial court that it had, indeed, been working on such a product with those features.

showing different product lines and Auto-CAD drawings. The binder provided by Rossi was merely a more recent version of the M.K. Plastics binder that Greenheck already had on hand. Such binders are common in the industry, and the information is largely duplicative of the content on a company's website. Rossi also gave Seliger a sketch on a piece of paper showing a nozzle wind band design with basic outline dimensions from an older M.K. Plastics binder. Seliger had already seen the design before Rossi showed it to him, and apparently the information contained in the sketch was of no use to Seliger in the development of the Vektor fan.

On June 4, 2004, M.K. Plastics filed a complaint for preliminary and permanent injunctive relief and for damages and a motion for preliminary injunction against Rossi. M.K. Plastics alleged that Rossi should be enjoined from using, selling, offering to sell, exporting, disseminating, distributing, copying, reproducing, destroying, hiding, or otherwise disclosing or using for any purpose the intellectual property of M.K. Plastics, including its trade secrets. In addition, M.K. Plastics alleged that Rossi should pay damages to the company because of his: (1) violation of the IUTSA; (2) conversion; (3) tortious conversion; and (4) unjust enrichment. On May 5, 2005, following a hearing on the motion for preliminary injunction, the trial court entered a 42–page order containing findings of fact, conclusions of law, and judgment pursuant to Indiana Trial Rule 52(A)(1). The trial court denied the motion for preliminary injunction, and M.K. Plastics now appeals.

## DISCUSSION AND DECISION [5]

M.K. Plastics argues that the trial court erred in denying its motion for preliminary injunction. Specifically, it contends that the trial court erred in concluding that Rossi's actions did not violate the IUTSA.

## I. Standard of Review

 As we consider these arguments, we note that when reviewing findings of fact and conclusions of law entered upon the denial of a motion for preliminary injunction pursuant to Trial Rule 52(A)(1), we must determine if the trial court's findings support its judgment and will reverse the judgment only when clearly erroneous. *Oxford Fin'l Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1141 (Ind.Ct.App.2003). Findings of fact are clearly erroneous only when the record lacks any evidence or reasonable inferences therefrom to support them. *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E.2d 49, 62 (Ind.Ct. App.2005). The trial court's judgment is clearly erroneous only if it is unsupported by the findings and the conclusions that rely upon those findings. *N. Elec. Co., Inc. v. Torma*, 819 N.E.2d 417, 421 (Ind. Ct.App.2004). We may neither reweigh the evidence nor reassess witness credibility. *Oxford Fin'l*, 795 N.E.2d at 1141. Additionally, even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law. *Lakes & Rivers Transfer v. Rudolph Robinson Steel Co.*, 795 N.E.2d 1126, 1132 (Ind.Ct.App.2003).

Furthermore, M.K. Plastics is appealing from a negative judgment and must, therefore, establish that the trial court's judgment is contrary to law. *N. Elec. Co.*, 819 N.E.2d at 421. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the

---

**5.** The Appellant's motion for leave to substitute authority is hereby granted.

trial court. *Id.* We review conclusions of law de novo and give no deference to the trial court's determinations about such questions. *Id.* at 422.

■■■ In seeking a preliminary injunction under the IUTSA, M.K. Plastics had the burden of establishing: (1) that its remedies at law are inadequate, causing irreparable harm pending resolution of its lawsuit; (2) that it has at least a reasonable likelihood of success on the merits at trial; (3) that the threatened injury to M.K. Plastics outweighs the potential harm to Rossi resulting from the proposed injunction; and (4) that the public interest would not be disserved by the granting of injunctive relief. *U.S. Land Servs.*, 826 N.E.2d at 63. M.K. Plastics was required to prove each of the four requirements by a preponderance of the evidence, and a failure to prove even one would have made the grant of an injunction an abuse of discretion. *Paramanandam v. Herrmann*, 827 N.E.2d 1173, 1179 (Ind.Ct.App. 2005). Finally, we note that an injunction is an extraordinary equitable remedy that should be granted only in rare instances where the law and facts are clearly within the moving party's favor. *PrimeCare Home Health v. Angels of Mercy Home Health Care, L.L.C.*, 824 N.E.2d 376, 380 (Ind.Ct.App.2005).

■■■ As an aside, we note that at oral argument, counsel for M.K. Plastics emphasized that to sustain the burden of showing a reasonable likelihood of success on the merits at trial, M.K. Plastics needed only to present a prima facie case. While it is true that to succeed on a motion for preliminary injunction a plaintiff must present a prima facie case, our inquiry—and that of the trial court—does not end there. Unlike a Rule 12(B)(6) motion to dismiss, we must examine both the plaintiff's and the defendant's respective sides of the story as elucidated before the trial court. *See Meury v. Eagle–Union Cmty. Sch. Corp.*, 714 N.E.2d 233, 238 (Ind.Ct. App.1999) (noting that a Rule 12(B)(6) motion should be granted only where it is clear from the face of the complaint alone that under no circumstances could relief be granted). Even if M.K. Plastics was initially able to put forth a prima facie case, if Rossi was able to poke holes in that case, or to shed a different light on the situation, or to convince the court that his version of the facts is more compelling, then the trial court properly denied the motion for preliminary injunction.

## II. IUTSA

■■■ Pursuant to Indiana Code section 24–2–3–2, a "trade secret" entitled to protection is information that derives independent economic value from "not being generally known" and "not being readily ascertainable by proper means" by other persons who can obtain economic value by its disclosure or use. Additionally, information is a "trade secret" only if it is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* A plaintiff seeking relief pursuant to the IUTSA must identify the trade secrets allegedly misappropriated by the defendant and carries the burden of proving that they exist. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 245–46 (Ind.Ct.App.2001). What constitutes trade secret information is a determination for the court to make as a matter of law. *PrimeCare*, 824 N.E.2d at 381.

### A. Trade Secrets

The trial court concluded as a matter of law that M.K. Plastics failed to demonstrate that it had a reasonable likelihood of success at trial of establishing that any trade secrets exist pursuant to the IUTSA. Appellant's App. p. 41–43. In part, the

trial court reached this conclusion because M.K. Plastics did not maintain the proper level of secrecy required by the IUTSA. Appellant's App. p. 42. M.K. Plastics notes that, as a matter of law, the steps taken to maintain secrecy need not be "overly extravagant" or designed to achieve "absolute secrecy," but must be reasonable depending on the facts and circumstances of each case. *Zemco Mfg.*, 759 N.E.2d at 246. Although not exhaustive, the *Zemco* court provided examples of actions sufficient to maintain the secrecy of trade secrets, including marking documents with labels reading "confidential," shielding confidential processes from a visitor's view, segregating sensitive information from general viewing, and locking up secret documents. *Id.*

Assuming for argument's sake that M.K. Plastics maintained the proper level of secrecy in general, we will turn to the three things that the trial court concluded that Rossi took from the company after ending his affiliation with M.K. Plastics: (1) a three-ring M.K. Plastics sales binder showing different lines of the company's product and containing AutoCAD drawings; (2) a sketch of a nozzle wind band design from another binder; and (3) contact information copied from the Maximizer program.

### 1. Sales Binder and Wind Band Design Sketch

■ The record reveals undisputed evidence that three-ring sales binders, including the AutoCAD drawings therein, are sales and marketing materials that are regularly distributed to independent manufacturer representatives and consulting engineers. In particular, the sketch of a nozzle wind band design that Rossi showed

to Seliger in 2004 came from an older M.K. Plastics binder already in Greenheck's possession that Seliger had already seen.

Moreover, the evidence shows that there is nothing secret or protected about the AutoCAD drawings within the binders. Apparently, manufacturer representatives and outside engineers in the marketplace are regularly provided not only with the drawings but also with CDs that enable the engineers to "drop the drawings in[to] their blueprints." Appellee's Br. p. 27. Thus, it is apparent that such "[g]enerally known or readily ascertainable information is outside the statutory protection of the [IUTSA]," *PrimeCare*, 824 N.E.2d at 382, because it is not, in the first instance, a secret of any kind.

### 2. Copied Contact Information from Maximizer

■ To begin with, the parties disagree as to whether the information contained within Maximizer constitutes protected trade secrets. M.K. Plastics points to *Northern Electric Co., Inc.* as support for its argument that the information is protected by the IUTSA. The *Northern Electric* court concluded that data compilation may constitute a trade secret under the IUTSA: "the integration of separate pieces of raw data, taken together, constitutes a unique compilation which, in order to duplicate, would require a substantial investment of time, expense, and effort, without which [the company] would lose a distinctive competitive advantage." 819 N.E.2d at 426. M.K. Plastics also points to a recognition that the "effort of compiling useful information, is of itself, entitled to protection even if the information is otherwise generally known." *U.S. Land Servs., Inc.*, 826 N.E.2d at 63–64.[6]

6. M.K. Plastics includes a lengthy argument in its brief that Rossi was an employee, rather

than an independent contractor, of the company. Rossi does not contest this assertion,

Rossi offered evidence that the names, addresses, and telephone numbers of manufacturer representatives and other industrial fan customers are readily available from numerous sources, including the Internet and association directories. Rossi also offered undisputed evidence that he retained only a copy of that readily-available contact information when he left M.K. Plastics, leaving behind the other fields of data he added during the parties' affiliation.

In response, M.K. Plastics insists that this information "is the essence of how business was created for" it, in other words, "who are the decisions-makers [sic] within those entities to contact if Rossi were to market and sell M.K. Plastics' products." Reply Br. p. 6. It also argues that the data compilation in Maximizer was more than just an address book because it included, among other things, the descriptions of certain equipment, model numbers of products, performance data, and sales prices. But its request that we conclude that the trial court erred is merely an invitation to reweigh the evidence offered by both parties, which our standard of review does not permit. The trial court observed the multi-day trial and, at its conclusion, determined that the Maximizer program did not contain protectible trade secrets and that, in any event, Rossi retained only information that was readily available to the general public. Nothing in the record suggests that the trial court erred in reaching that conclusion.

### B. *Misappropriation*

Giving M.K. Plastics the benefit of the doubt as to the existence of protectible

trade secrets, we next turn to the company's contention that the trial court erred in concluding as a matter of law that M.K. Plastics failed to show a reasonable likelihood of success at trial of establishing that Rossi misappropriated any trade secrets. In particular, M.K. Plastics argues that Rossi engaged in misappropriation by taking and then wrongfully disclosing or threatening to disclose the company's trade secrets.

The IUTSA defines "misappropriation," in pertinent part, as follows:

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; [or]

(B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

I.C. § 24–2–3–2. "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* Actual or threatened misappropriation may be en-

---

merely labeling the issue "superfluous." Appellee's Br. p. 24. Indeed, it is not readily apparent to us how Rossi's employment status is relevant to the underlying issue, inasmuch as neither caselaw nor the IUTSA itself suggest that the statute applies to employees but

not to independent contractors. We cannot see why there would be two different standards, and conclude that the IUTSA applies to Rossi whether he was an employee of or an independent contractor for M.K. Plastics.

joined at the preliminary injunction phase of trial. Ind.Code § 24–2–3–3(a).

M.K. Plastics argues that the record shows that Rossi "systematically harvested technical data," Appellant's Br. p. 28, about the company's products during Rossi's tenure there. As evidence of the "harvest," M.K. Plastics points to the following facts: (1) Rossi had access to and created memoranda describing product characteristics and applications; (2) Rossi had access to research and development work reports and design use and testing information on prototypes; (3) Rossi was present at and drafted the minutes for a company meeting where the discussion centered on patent-pending products, vacuum seals, wash controls, fan pricing, and market strategy; (4) Rossi had access to AutoCAD drawings on the company's restricted engineering network; (5) Rossi had had access to engineering research and development information; and (6) less than one month before he resigned, Rossi asked an M.K. Plastics engineer about the outlet diameter of a company product. While all of this evidence shows that Rossi may have had access to a multitude of sensitive information, there is no evidence suggesting that he took any affirmative action to misappropriate—or threaten to misappropriate—the information.

M.K. Plastics also contends that Rossi "pirated away," Appellant's Br. p. 28, trade secret information when he left the company. In particular, M.K. Plastics focuses on the Maximizer, V–Fan database, and fan design elements.

### 1. Maximizer Program

M.K. Plastics argues that when Rossi left the company, he retained the Maximizer program and refused to return all of the data contained on the three company computers. As we concluded above, the trial court was entitled to sift through the evidence and give substantial weight to Rossi's testimony that he retained only a portion of the information contained in the Maximizer program—only the readily-available, non-secret contact information—and returned, without retaining, all of the additional field data in the program specific to the company's operations. Similarly, the trial court was entitled to conclude, based on testimony, that Roberts agreed to the reformatting of the computers' hard drives and that Rossi was merely consolidating and copying all of the information from the desktop computers onto the laptop, which he then delivered to M.K. Plastics representatives in Montreal. It is not for us to reweigh the evidence or judge the credibility of witnesses, as that is the trial court's province. Nothing in the record suggests that the trial court erred in concluding that Rossi did not misappropriate or threaten to misappropriate protectible information contained in the Maximizer program.

### 2. V–Fan Database

M.K. Plastics next argues that Rossi had access to and retained information stored on the V–Fan database, including pricing, customer, and order information. The database also includes the proprietary formula used by M.K. Plastics to calculate its sales price based upon the cost of components. As evidence of Rossi's misappropriation, the company notes that Rossi was transferring files from the V–Fan database while he was contemplating leaving M.K. Plastics to work for Greenheck.

Rossi argues that M.K. Plastics "stretches testimony ... beyond its meaning in an attempt to portray Rossi's activities in a negative light." Appellee's Br. p. 31. In particular, Rossi offered evidence that Roberts agreed that it was part of Rossi's job and appropriate for him to

regularly download V–Fan program information onto his personal computer. Additionally, while Rossi did attempt to download information from the V–Fan program on July 10, 2003, he was only doing so to prepare reports for Roberts and, in any case, was unable to complete the download because of technical problems. Yet again, we must conclude that the trial court sifted through the large volume of evidence offered at the hearing and reached its legal conclusion based upon facts in the record. There is nothing in the record to suggest that it erred in concluding that Rossi did not misappropriate or threaten to misappropriate data from the V–Fan database.

### 3. Fan Design Data

■ Finally, M.K. Plastics argues that Rossi had extensive access to its protected technical information regarding its fan design data. The company points out that during Rossi's tenure, he saw private sketches or drawings of M.K. Plastics' unique nozzle designs used on its exhaust fans. M.K. Plastics also emphasizes that shortly before joining Greenheck, Rossi asked an M.K. Plastics engineer for specific confidential information regarding a nozzle outlet diameter of an M.K. Plastics product.

As to M.K. Plastics' assertion that Rossi had access to protected technical information, the record reveals evidence supporting Rossi's contention that, while he had the opportunity to view M.K. Plastics' engineering drawings, he did not have access to the engineering materials contained in the engineering computer that was not linked to the company's larger computer network. Thus, he did not obtain access to and see restricted engineering files.

M.K. Plastics also argues that before Rossi left the company's employ, he elicited confidential information regarding the nozzle outlet diameter of an M.K. Plastics product. But the testimony cited by M.K. Plastics to support this assertion says nothing about the information being confidential, secret, or proprietary. Moreover, the record reveals elsewhere that this information was contained in M.K. Plastics brochures published and distributed to manufacturer representatives and end-user customers. Finally, Rossi explained at trial that he questioned the engineer to respond to a customer seeking confirmation that the outlet diameter information she had from an old brochure was still accurate.

Turning next to the Vektor fan, M.K. Plastics argues that after Rossi went to work for Greenheck, Greenheck changed directions in its development of the Vektor fan to include the same novel design features that M.K. Plastics had developed in secret. But as noted above, M.K. Plastics offered no evidence aside from testimony that it was, in fact, working on a product with such features. No engineering designs or sketches, no photographs, no notes. It is difficult for us to imagine a trial court concluding that Greenheck's Vektor fan copies certain elements of an M.K. Plastics fan whose very existence the company was unable or unwilling to prove.

Additionally, the trial court was entitled to dismiss M.K. Plastics' contention that Greenheck's Vektor fan was the result of Rossi's misappropriation of trade secrets. First, Rossi testified that he did not take any secret engineering information to Greenheck. Second, the trial court could have concluded that M.K. Plastics did not persuasively demonstrate similarities between the M.K. Plastics and Greenheck fans because its position was not based on comparative or technical analysis but was instead based solely upon a sales brochure and because there was no M.K. Plastics documentation to observe. Finally, it was for the trial court to evaluate Seliger's

credibility. Seliger testified that Greenheck's work on the Vektor product began several months before Rossi's arrival, that the Vektor fan was based on research dating back to 2002, that the Vektor fan is not in any way similar to M.K. Plastics' fan, and that Greenheck's product does not incorporate any unique or novel features developed by M.K. Plastics.

M.K. Plastics responds by pointing out that Seliger referenced several unique features of the Vektor fan, but he based his assumption on products currently available in the marketplace, not on any of M.K. Plastics' products currently in ongoing research and development. We note again that M.K. Plastics offered no evidence of the details of its products in ongoing research and development.

Finally, M.K. Plastics emphasizes that while it admits that certain elements of the AXCL fan are in the public domain, it was the unique and previously undisclosed combination of elements that M.K. Plastics was working on in research and development that Rossi allegedly misappropriated. At the time that Rossi left M.K. Plastics, there was no fan on the market that contained all of the specific design elements at issue until the Vektor debuted. It argues, without citation to the record, that Rossi convinced Greenheck to change the direction in its Vektor fan design. As noted above, however, Rossi offered evidence that in fact, Greenheck had been working on the Vektor fan for months before his arrival, that he had little or nothing to do with the technical aspects of the product's development, and that Rossi never discussed any confidential information regarding M.K. Plastics' products with Seliger.

At the risk of sounding like a broken record, we can encapsulate our response to all of M.K. Plastics' arguments regarding the Vektor fan, the AXCL fan, and Rossi's misappropriation, threatened or actual, of M.K. Plastics' sensitive information: both parties offered evidence and witnesses at the hearing, the trial court observed a multi-day trial and sifted through large volumes of evidence, and there is more than sufficient evidence to support each of the trial court's conclusions of law. That there is evidence pointing to another conclusion is of no moment, inasmuch as it was for the trial court—not us—to weigh the evidence and judge the credibility of witnesses. Thus, we conclude that the trial court properly determined that Rossi did not misappropriate or threaten to misappropriate any protected trade secrets of M.K. Plastics.

Ultimately, therefore, there was ample evidence for the trial court to conclude that the materials that Rossi retained after leaving M.K. Plastics were not trade secrets and that he did not misappropriate or threaten to misappropriate any protected information. Thus, the trial court properly concluded that M.K. Plastics failed to prove a reasonable likelihood of success on the merits at trial.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.