**NORTHERN ELECTRIC COMPANY, INC., Appellant–Plaintiff,**

v.

**Patrick L. TORMA, Jr., and Hy– Tech Automation Repair, Inc., Appellees–Defendants.**

No. 71A05–0402–CV–99.

Court of Appeals of Indiana.

Dec. 13, 2004.

Rehearing Denied Feb. 16, 2005.

Paul J. Peralta, D. Lucetta Pope, Baker & Daniels, South Bend, IN, for Appellant.

William L. Wilson, Bernard E. Edwards, Jr., Anderson, Agostino & Keller, P.C., South Bend, IN, for Appellees.

---

1. Oral arguments were held on November 8, 2004, in the Court of Appeals' courtroom.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Northern Electric Company, Inc. (Northern Electric), appeals the trial court's Findings of Fact and Conclusions of Law in favor of Appellees–Defendants, Patrick L. Torma Jr. (Torma) and Hy–Tech Automation Repair, Inc. (Hy–Tech), with regard to Northern Electric's Complaint, alleging a violation of the Indiana Trade Secret Act, statutory conversion, and breach of fiduciary duty.

We reverse.[1]

### ISSUES

Northern Electric raises seven issues on appeal, which we consolidate and restate into the following five issues:

(1) Whether the trial court erred in concluding that an employee, assigned to repair servo motors, owns the data generated in the course of his duties and compiled in a useable format on his home computer;

(2) Whether the trial court erred in determining that the compilation of data is not entitled to trade secret protection under the Indiana Uniform Trade Secret Act (IUTSA);

(3) Whether the trial court erred in concluding that Torma did not commit statutory conversion within the meaning of the Victim's Relief Act, Ind.Code § 34–24–3–1;

(4) Whether the trial court erred in concluding that Torma did not breach his fiduciary duty to Northern Electric; and

(5) Whether the trial court abused its discretion in awarding attorneys'

We hereby congratulate and thank counsel for their excellent presentation.

fees pursuant to I.C. § 34–52–1–1 based on the finding that Northern Electric failed to reasonably protect its trade secrets.

*FACTS AND PROCEDURAL HISTORY*

Northern Electric is a family-owned electric motor repair shop in South Bend, Indiana, employing approximately thirty employees. Northern Electric's president, Howard Dosmann (Dosmann), is also its sole shareholder. During the 1980s, Northern Electric began repairing servo motors for its customers. Unlike conventional motors, servo motors rely on a closed loop electrical system to achieve the precise velocities and positions required by manufacturing machinery used in robotic, computer numeric control, and other similarly sophisticated applications. Electrical signals travel between the servo motor, feedback devices, and a drive that instructs the motor to turn and stop in precise increments. While a malfunction in regular electric motors can often be diagnosed by visually inspecting the motor, repairing a computer malfunction in a servo motor requires between ten and fifteen bits of data that differ for each make and model.

Northern Electric continued to repair servo motors until the mid–1990s, when a customer's servo motor was not properly repaired. Torma, who had been an employee since 1990, approached Dosmann, seeking permission to continue the repair service for servo motors. Dosmann consented and placed Torma in charge of the servo motor department. While Torma supervised the department, the servo motor repair service grew, eventually accounting for approximately 33% of Northern Electric's business by the time Torma left the company.

As was his custom in previous positions, Torma assembled motor repair data in a spiral notebook. The compiled information included readings and settings that aid servo motor repair. He gathered the data from readings he took or discerned during the actual repair of the motor, and from data collected by other Northern Electric employees. Additionally, Torma also gained information from personal contacts with representatives of manufacturers and other servo motor shops, manuals, service bulletins maintained by Northern Electric, and various internet sites. As supervisor of the servo motor department, he directed the other technicians to similarly record and maintain data readings. This compilation of information proved helpful in repairing servo motors for Northern Electric's customers.

Although Torma initially maintained his data in a spiral notebook, after a while, he adopted a daily practice of assembling motor readings and other useful repair information on a photocopied job order, and entering the data into a word processing file, organized by manufacturer, stored on his home computer. He discarded the photocopied job order after he entered the data in his computer. He saved this compilation of data on his home computer and on a floppy disk (later on CD–ROM) which he used every day at work. His compilation is the result of seven years of data collection for more than 650 servo motors. He protected the data by locking it in his 500–pound toolbox, keeping it with him, or taking it home. Even though he allowed other Northern Electric employees to copy certain data, he never permitted another technician access to his entire compilation.

In June of 2002, Torma terminated his employment with Northern Electric after he was unable to reach an agreement with his employer on his compensation and duties. Prior to his resignation, Dosmann had unsuccessfully pursued a non-compete agreement with Torma. Upon leaving the

company, Torma refused to return the data he had gathered during the course of his employment with Northern Electric. After his departure, Torma began working at Hy–Tech, a competing servo motor repair company he had founded before resigning his position at Northern Electric.

On July 15, 2002, Northern Electric filed a request for a temporary restraining order and temporary and permanent injunctions against Torma. During a hearing on the same day, the trial court ordered Torma to return all prototypes obtained by him while in Northern Electric's employment, to provide Northern Electric with a copy of all servo motor specifications developed while employed, and to keep complete records as to any use of these specifications by him and any economic advantage he derives from such use. From October 15 through October 17, 2003, a bench trial was held on Northern Electric's Complaint, alleging a violation of the Indiana Trade Secret Act, statutory conversion, and breach of fiduciary duty. On January 16, 2004, the trial court entered judgment in favor of Torma and Hy–Tech and issued Findings of Fact and Conclusions of Law.

Northern Electric now appeals. Additional facts will be provided as necessary.

### DISCUSSION

#### I. *Data Compilation*

Northern Electric first contends several of the trial court's conclusions with regard to the data compilation. Specifically, Northern Electric asserts that the trial court erred in concluding:

(1) that Torma is the owner of the data compilation stored on the computer discs;

(2) that the data compilation is not entitled to trade secret protection;

(3) that Northern Electric did not prove by a preponderance of the evidence its claim for statutory conversion; and

(4) that Northern Electric did not prove, by a preponderance of the evidence, its claim for breach of fiduciary duty.

We shall review each of these claims in turn.

#### A. *Standard of Review*

In the instant case, the trial court entered special findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A). Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings, and second, we determine whether the findings support the judgment. *Infinity Products, Inc. v. Quandt,* 810 N.E.2d 1028, 1031 (Ind.2004). Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In determining whether the findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

Because Northern Electric appeals from a negative judgment, it must demonstrate that the trial court's judgment is contrary to law. *Id.* at 1032. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. *Id.* In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or

inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App. 2001). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

### B. *Ownership of the Compilation*

Northern Electric first contends that the trial court clearly erred by concluding that it did not own the servo motor repair data collected by its agent, Torma. Specifically, Northern Electric asserts that, based on agency principles, the company owns the data compilation because Torma collected the data as part of his assigned duties as supervisor of the servo motor repair department. Conversely, Torma argues that unless an agreement to the contrary exists, the creator of the valuable information remains the owner of the information.

The question of whether an employee owns the compilation of data assembled in his own time but based upon raw data collected at his place of employment presents us with an issue of first impression in Indiana. In support of their respective arguments, both parties rely on the Restatements and out-of-state case law. In particular, the Restatement (Third) of Unfair Competition § 42 cmt. e., states with regard to allocation of ownership between employers and employees:

> [t]he law of agency has established rules governing the ownership of valuable information created by employees during the course of an employment relationship. In the absence of a contrary agreement, the law ordinarily assigns ownership of an invention or an idea to the person who conceives it. However, *valuable information that is the product of an employee's assigned duties is owned by the employer, even when the information results from the applica-*tion of the employee's personal knowledge or skill:

> [§ 397 cmt. a:]
> If however, one is employed to do experimental work for inventive purposes, it is inferred ordinarily, although not so specifically agreed, that patentable ideas arrived at through the experimentation are to be owned by the employer. This is even more clear where one is employed to achieve a particular result which the invention accomplishes. On the other hand, if one is employed merely to do work in a particular line in which he is an expert, there is no inference that inventions which he makes while so working belong to the employer.

Restatement (Third) Unfair Competition § 42 cmt. e (1995) (quoting Restatement (Second) of Agency § 397 cmt. a) (emphasis added). Comment e further clarifies that "[a]lthough the rules governing ownership of valuable information created during an employment relationship are most frequently applied to inventions, the rules are also applicable to information such as customer lists, marketing ideas, and other valuable business information. *If an employee collects or develops such information as part of the assigned duties of the employment, the information is owned by the employer.*" (emphasis added).

Referencing Restatement § 42, the New York Supreme Court held in *Pullman Group, LLC., v. Prudential Insurance Co. of America,* 288 A.D.2d 2, 733 N.Y.S.2d 1, 2 (N.Y.App.Div.2001), that an employer owns alleged trade secrets created by an employee within the scope of his assigned duties. In *Pullman Group, LLC.,* a financial investment firm's former employee claimed that a certain banking transaction he had created while acting within the scope of his assigned duties belonged to him and not his employer. *Id.* at 2. The

court analyzed that since the former employee was responsible for designing and promoting investment banking transactions, the trade secret was created during the course of his regular duties. *Id.* Therefore, the court concluded, the employer owned the banking transaction *ab initio. Id.*

Although decided on a slightly different scenario, but nevertheless instructive, is *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty,* 808 F.Supp. 1555 (S.D.Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir.1993). In *Merrill Lynch,* the brokerage firm brought an action for preliminary injunction against a former account executive for breach of his non-compete agreement. *Merrill Lynch,* 808 F.Supp. at 1555. The account executive argued that Merrill Lynch did not have a legitimate business interest in the customer lists because he had compiled the entire list in his own time and at his own expense. *Id.* at 1557–58. He also testified that he used Merrill Lynch's facilities to solicit and service those customers. *Id.* at 1558. Specifically, the account executive used Merrill Lynch's phones, postage, promotional literature, name, and reputation when communicating with prospective and current clients; and further used the brokerage firm's full service facilities to open client accounts, effectuate transactions, and service clients generally. *Id.* Based on these facts, the district court found that Merrill Lynch had made a substantial and essential contribution to the list's development, and thus concluded that the brokerage firm had a legitimate business interest in the customer list. *Id.*

Clearly building upon the Restatements, the case law factually focuses on an employee's position and scope of assignment, including all reasonable inferences therefrom, to decide the issue of ownership of information. It is apparent that 'assigned duties' is the decisive element, regardless of when the employee actually performs them.

▮ In the instant case, our review of the trial court's conclusion, that Torma owns the data compilation, leaves us with a firm conviction that a mistake was made. *See Infinity Products, Inc.,* 810 N.E.2d at 1031. Without citing any legal principle or authority for its conclusion, the trial court based its decision on the following findings: (1) Torma started and supervised Northern Electric's servo motor repair division; (2) during the repair of servo motors, Torma collected data from the servo motor that would aid him in diagnosing future malfunctions and formulating repair strategies; and (3) Torma and the other technicians made the data each collected and maintained individually available to one another for use in actual servo motor repair projects. Thus, by reaching its conclusion that Torma owned the data compilation, the trial court implicitly rejected the notion that data assembly is part and parcel of Torma's position.

Nonetheless, we are not persuaded. Overwhelming evidence presented at trial, including the trial court's own findings, establishes that data compilation falls squarely within the scope of a servo motor repair technician's assigned duties. Testimonial evidence by Torma indicates that virtually all information assembled in the data compilation was obtained during his working hours at Northern Electric. In particular, Torma testified that he gathered data from readings he took or discerned during the actual repair of the motors. He further stated that he would copy information out of manufacturers' manuals, received and maintained by Northern Electric, by using the company's copier. If the data was not readily available in the manual, Torma clarified that he

would consult the manufacturers' internet site.

The evidence supports that initially Torma maintained this data collection in spiral notebooks; however, after a while he adopted a daily practice of assembling motor readings and other useful repair information on a photocopied job order. Torma testified that during his own time he entered all this assembled data into a word processing file, organized by manufacturer, and stored it on his home computer. He clarified that he would consult his compilation, which is the result of seven years of data collection for more than 650 servo motors, every day at work. During testimony, he not only admitted that ninety percent of his time dedicated to generating data was performed at work but also conceded that the data information compiled in the notebook belonged to Northern Electric.

Further review of the record shows that, as supervisor of the servo motor repair department, he directed the other employees to similarly collect, record, and maintain data readings. Employee Bill Alerding stated that Torma not only maintained his own data, but also requested a copy of the other employees' data when they worked on a servo motor unfamiliar to Torma. In sum, every trial witness, including Torma, testified to the importance of collecting servo motor data in the course of performing repairs. Everyone acknowledges that the quality of the maintained data resulted in more efficient and rapid repairs in the future. Moreover, Northern Electric's Vice President of Operations, Rick Meece, testified that during several conversations with Torma, they investigated the possibility of making the data collection readily accessible to all employees in the servo motor repair department by storing it on the company's server. The record reflects that Torma refused, pleading lack of time and computer illiteracy.

Nevertheless, Torma now contends that his data compilation should be characterized as an "invention" pursuant to § 397 cmt. a of the Restatement. Based on this section of the Restatement, Torma maintains that since he created the valuable compilation without being specifically assigned to do so by Northern Electric, he now owns the entire compilation. We find this argument to be without merit. The issue in the instant case does not revolve around the idea or invention of compiling the information according to the servo motor's manufacturer; instead, Northern Electric contests the ownership of the underlying raw data used in the compilation. From the evidence before us, it is apparent that this raw data resulted from readings of servo motors taken during repairs at Northern Electric and information collected from manuals and the internet. The record further reflects that collecting repair data is a standard practice in the industry, and compilations are even bought and sold. We find the fact that Torma might have organized the raw data more comprehensively does not amount to the sort of unanticipated invention or intellectual virtuosity that § 397 of the Restatement is intended to protect.

Therefore, mindful of the parties' respective arguments and the evidence presented at trial, we agree with Northern Electric that Torma's harvesting of raw data during work hours and the subsequent compilation of harvested data in his home computer during his own time does not make the data his. *See, e.g., Merrill Lynch,* 808 F.Supp. at 1557–58. It is clear that but for Torma's employment at Northern Electric, he would not have had access to the wealth of servo motor repair data that he assembled in his compilation. Using his employer's facilities and oppor-

tunities, Torma not only supervised the motor servo repair department but was also instrumental in its success by directing all employees to collect and maintain data generated from the servo motors. This generated data resulted in more efficient diagnoses and formulation of repair strategies. Thus, given the facts before us, along with all reasonable inferences and applicable case law, we come to the opposite conclusion that Torma's compilation of Northern Electric's servo motor repair data clearly arose out of his assigned duties as supervisor of the department. *See Infinity Products, Inc.*, 810 N.E.2d at 1031. Accordingly, we find that the trial court's conclusion is contrary to law and hold that Northern Electric is the owner of the data collected by Torma.

### C. *Trade Secret*

Next, Northern Electric contends that the trial court erred as a matter of law by deeming the data generally known or readily accessible, and by concluding that Northern Electric failed to take reasonable measures to maintain the secrecy of the servo motor data collected by Torma and other employees.

■ The Indiana Uniform Trade Secret Act (IUTSA) defines trade secret as:

Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 24–2–3–2. Thus, a protectable trade secret has four characteristics: (1)

information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy. *Hydraulic Exchange and Repair, Inc. v. K.M. Specialty Pumps, Inc.*, 690 N.E.2d 782, 785–86 (Ind. Ct.App.1998).

In *Amoco Production Co. v. Laird*, 622 N.E.2d 912, 916 (Ind.1993), our supreme court acknowledged the difficulty of defining trade secrets under the Act. The supreme court noted that no general and invariable rule can be constructed to govern the determination of whether a device, process, or other compilation of information should be classified as a trade secret. *Id.* at 916. Therefore, because a determination of a trade secret is so fact-specific, "the same information that qualifies as a trade secret under one set of facts may not be afforded protection under a different set of facts." *Id.* In its analysis of *Amoco*, our supreme court relied primarily on out-of-state case law, explaining that in adopting the IUTSA, Indiana legislators sought the uniform application of the definition of trade secret, consistent with the application of the Act in other adopting jurisdictions. Accordingly, our supreme court stated, that case law from other Uniform Trade Secret Act jurisdictions becomes relevant authority for the construction of trade secret law in Indiana. *Id.* at 917–18.

### 1. *Readily Ascertainable*

Initially, Northern Electric asserts that the trial court erred as a matter of law by deeming the data to be generally known or readily ascertainable by proper means. *See* I.C. § 24–2–3–2(1). In defining the statutory meaning of "readily ascertainable by proper means," *Amoco* appears to be the seminal case. In *Amoco*, our su-

preme court, in an attempt to define the term, rejected earlier Indiana case law that adhered 'readily ascertainable' to an economic infeasibility standard. *Id.* at 919. Instead, our supreme court acknowledged the term to be ambiguous and held that "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the IUTSA." *Id.* The supreme court further noted that the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known. *Id.* Furthermore, the court explained that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage. *Id.* (citing *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 738 P.2d 665, 675 (1987)).

On the facts presented in *Amoco*, the supreme court concluded that while some of the tools leading to Amoco's site discoveries of potential oil reserves were easily accessible within the public domain, taken together, the integration of pertinent site information and resultant projections as to potential oil reserves constitutes a unique compilation of information not previously known in the marketplace. *Id.* at 920.

■ In the case at bar, the record establishes that in building his data compilation Torma utilized accessible information already within the public domain. Specifically, he compiled servo motor data gleaned from manufacturers' manuals and the internet. However, notwithstanding Torma's use of some information residing in the market place, the compilation can be characterized as a unique effort. *See id.*

at 919. At trial, Torma testified that he invested considerable time and effort in the data compilation; specifically, he stated that he gathered the data over a period of more than seven years and devoted at least 1,892 hours to organizing the data.

Furthermore, the record reveals that the compilation gained independent economic value by increasing Northern Electric's efficiency in repairing malfunctioning servo motors. Moreover, Torma himself admitted to the compilation being valuable by refusing to return the data without compensation upon resigning from Northern Electric. The economic value of the data combined with the competitive advantage it offered was reinforced by testimony of Eddie Harmon (Harmon), president of a competing servo motor repair shop. Harmon unequivocally insisted that, if starting his business now, he would offer Torma $100,000 for the data compilation.

Therefore, we conclude that the integration of separate pieces of raw data, taken together, constitutes a unique compilation which, in order to duplicate, would require a substantial investment of time, expense, and effort, without which Northern Electric would lose a distinctive competitive advantage. *See id.* Consequently, we find that the trial court erred as a matter of law by concluding the data compilation to be readily accessible.

### 2. *Reasonable Steps to Maintain Secrecy*

Next, Northern Electric disputes the trial court's conclusion that as a matter of law the company failed to take reasonable efforts to maintain the secrecy of the servo motor data. *See* I.C. § 24-2-3-2(2). In this regard, *Zemco Manufacturing, Inc. v. Navistar International Transportation Corp.*, 759 N.E.2d 239 (Ind.Ct.App.2001), *reh'g denied, trans. denied*, is the only appellate decision in Indiana to address

the issue of what constitutes reasonable steps under IUTSA.

In *Zemco,* we held that "[t]he owner of the alleged trade secret must take reasonable, though not overly extravagant, measures to protect its secrecy. Absolute secrecy is not required. What is considered 'reasonable' under the facts of one case may be considered inadequate under the facts of another." *Id.* at 246. By referencing *Elm City Cheese Co., Inc. v. Federico,* 251 Conn. 59, 752 A.2d 1037, 1049 (1999), the *Zemco* court provided us with a non-exhaustive list of examples of actions which may be undertaken to maintain secrecy: (1) requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; (2) posting warning or cautionary signs, or placing warnings on documents; (3) requiring visitors to sign confidentiality agreements, sign in, and shielding the process from their view; (4) segregating information; (5) using unnamed or codenamed ingredients; and (6) keeping secret documents under lock. In taking reasonable steps, the *Zemco* court also concluded that an explicit promise of confidentiality is not necessary if the recipient of the information knew or should have known that the information was a trade secret and the owner expected the recipient to keep the information secret. *Id.* at 247 (quoting *Flotec, Inc. v. Southern Research, Inc.,* 16 F.Supp.2d 992, 1006 (S.D.Ind. 1998)).

■ Here, in support of its argument, Northern Electric relies on general principles of agency, claiming that an agent is subject to a duty of loyalty to his principal to act solely for the benefit of his principal. *See Potts v. Review Bd. of Ind. Employment Security Div.,* 475 N.E.2d 708, 711 (Ind.Ct.App.1985), *reh'g denied, trans. denied.* As such, Northern Electric maintains that any steps taken by Torma must be imputed to Northern Electric. Accordingly, Northern Electric relies on a twofold analysis: the security steps taken by Torma, as agent of Northern Electric, and the steps imposed by the company itself. Conversely, Torma asserts that his own efforts to protect the data compilation should be dismissed because there is no evidence that he acted in accordance with Northern Electric's direction.

We recognize that the statute is silent as to who carries the burden of instituting reasonable efforts to ensure protection, and merely states that "a trade secret ... is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* I.C. § 24–2–3–2. However, it is a well-established rule that even in the absence of any specific directions by the employer, an employee is required to carry out the work in the best interest of the employer. *Potts,* 475 N.E.2d at 711. As such, we agree with Northern Electric that Torma, as Northern Electric's agent, is subject to a duty to act solely for the benefit of his employer. *See id.* Accordingly, in light of these general principles, Torma's own efforts to protect the data compilation must be attributed to Northern Electric.

■ Regarding Torma's security precautions, Northern Electric first asserts that general duties, rather than specific directives, lie at the heart of this case. Thus, Northern Electric focuses on Torma's position as supervisor of the servo motor repair department, rather than on any explicit guidelines for confidentiality provided by Northern Electric. The record reflects that as supervisor, Torma habitually locked the data compilation in his 500–pound toolbox, or took it home at the end of the day. Testimony further establishes that while Torma allowed other employees to copy certain data, he never permitted an employee to copy the entire

compilation. Moreover, Kenneth Sheetz (Sheetz), a former employee of Northern Electric, stated at trial that prior to leaving his employment, he was explicitly told to leave behind his spiral notebook, containing information discerned from repairing servo motors.

With regard to Northern Electric's imposed security efforts, the record discloses that Northern Electric limits the access to its facility with a coded entrance system. However, the evidence also establishes that almost all employees have a personal key to the building and knowledge of the code. Besides this very meager security measure, we note that the record is devoid of any evidence that the company specifically alerted its employees to the confidential nature of the servo motor repair data. Northern Electric now attempts to decrease the significance of the lack of security measures by asserting that since no security leaks happened for ten years until Torma left his employment, its protective actions must necessarily have been reasonable and adequate.

In *Syntex Ophthalmics, Inc. v. Novicky*, 214 U.S.P.Q. 272, 277, 1982 WL 63797 (N.D.Ill.1982), *aff'd*, 701 F.2d 677 (7th Cir. 1983), the court held that even if precautionary security measures had been in place, there is nothing to suggest that the misappropriation of Syntex' trade secret would not have occurred. The court continued that, rather, the misappropriation was the result of misplaced trust, not lax security. *Id.* Thus, the court concluded, under those circumstances, where the security lapses were not the cause of the misappropriation, the lapses should not be the basis for denying protection. *Id.* Referencing this decision, Northern Electric asserts that, likewise here, the security lapse was not the basis for the breach; instead, Northern Electric's misplaced trust in a long-term employee resulted in

the security breach. *Id.* Our review of the record indicates that Northern Electric is a family-owned business, with only thirty employees. Evidence presented at trial reflects that most employees are long-term and view themselves as having a longstanding and trusting relationship with the company. Furthermore, although the record indicates that Northern Electric attempted, at the eleventh hour, to bind Torma to a non-compete agreement, it could not meet Torma's price.

As we stated before, the statute does not require absolute secrecy; rather, reasonable security measures are sufficient to incur the statutory protection. *See Zemco*, 759 N.E.2d at 246. Under the circumstances, we conclude that Northern Electric took reasonable measures to secure the secrecy of its data compilation. It is apparent that Northern Electric prides itself on being a small family-owned successful business. Part of this success is due to its servo motor repair department. It can be reasonably inferred that because of its small size and long-term employment relationships, Northern Electric trusted its employees to keep its data compilation confidential. We also note that since the inception of the servo motor department with Torma as supervisor in the mid-1990s, no security breaches have occurred. Furthermore, even in the absence of any specific directions by the Northern Electric, we find Torma's own security measures unquestionably contributed to the maintenance of confidentiality. *See Potts*, 475 N.E.2d at 711. The evidence establishes that Torma took reasonable precautions to prevent unauthorized and unlimited access to the data compilation. Thus, viewed as a whole, we hold that Northern Electric took reasonable precautions to maintain the secrecy of its data compilation. Accordingly, we hold that the trial court erred as a matter of law by conclud-

ing that Northern Electric did not reasonably protect the data. *See Carmichael,* 754 N.E.2d at 625.

In sum, based on the foregoing, we hold that all statutory elements for the existence of a trade secret are satisfied. *See* I.C. § 24–2–3–2. Consequently, we find that the trial court erred as a matter of law by concluding that the compilation of servo motor data is not entitled to trade secret protection. *See Carmichael,* 754 N.E.2d at 625. Accordingly, we reverse the trial court's conclusion.

### 3. *Misappropriation of Trade Secret*

■ Lastly, Northern Electric claims that, contrary to the trial court's conclusion, Torma misappropriated the company's trade secret by refusing to return the data compilation upon leaving Northern Electric's employment. Under IUTSA, misappropriation is defined as the

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who ...

(A) used improper means to acquire the knowledge of the trade secret.

I.C. § 24–2–3–2.

Here, Meece's testimony clarifies that when Torma left the company on his last workday, Meece requested him to leave the data compilation behind. According to Meece, Torma refused to comply, absent compensation for the compilation. It is clear that by his refusal to return the data compilation, which is Northern Electric's property and which Torma had compiled on the company's behalf, his possession of the data became unauthorized and his acquisition improper. *See* I.C. § 24–2–3–2. Accordingly, the trial court erred in concluding that Torma did not misappropriate

Northern Electric's trade secret. *See Carmichael,* 754 N.E.2d at 625.

### D. *Conversion*

■ Next, Northern Electric contends that the trial court erred as a matter of law by concluding that Torma did not commit statutory conversion pursuant to I.C. § 35–43–4–3, while the record establishes every element of the claim. The Victim's Relief Act, I.C. § 34–24–3–1, permits a person who suffers a pecuniary loss as a result of a violation of I.C. § 35–43–4–3, criminal conversion, to recover treble damages and attorneys' fees. The statute defines criminal conversion as: "[a] person who knowingly or intentionally exerts unauthorized control over the property of another person commits criminal conversion, a Class A misdemeanor." I.C. § 35–43–4–3. "To exert control over property" is defined by statute as "to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property or to secure, transfer, or extend a right to property." I.C. § 35–43–4–1. A criminal conviction is not a prerequisite for bringing this civil action. *See Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct. App.1999), *reh'g denied, trans. denied.* And unlike a criminal trial, a claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant. *Id.*

■ Having already determined the existence of the first two elements of a statutory conversion claim, *i.e.,* the company exclusively owned the data compilation, and the deprivation of the compilation caused a pecuniary loss, we turn to the remaining issue of whether Torma "knowingly or intentionally exerted unauthorized control" over Northern Electric's data compilation. Our review of Torma's trial testimony reveals the following colloquy:

[NORTHERN ELECTRIC'S COUNSEL]: The information that you took

home with you, Northern Electric has a right to that, did they not?

[TORMA]: Yes.

[NORTHERN ELECTRIC'S COUNSEL]: Okay. That was their information, was it not?

[TORMA]: Yes.

(Transcript p. 225).

Based on this testimony, it is clear that Torma knew that the data belonged to Northern Electric. Thus, when he refused to return it at the company's request at the end of his employment, he knowingly exerted unauthorized control over the data. *See* I.C. § I.C. § 35–43–4–3. Accordingly, we agree with Northern Electric that the trial court erred as matter of law by concluding that the company failed to prove by a preponderance of the evidence its claim for statutory conversion. *See Carmichael,* 754 N.E.2d at 625. Therefore, we reverse the trial court's conclusion.

### E. *Fiduciary Duty*

As its final argument relating to the data compilation portion of the brief, Northern Electric argues that the trial court erred as a matter of law by concluding that it had not proven its claim for breach of fiduciary duty by a preponderance of the evidence. In particular, Northern Electric relies on general agency principles, establishing that the agent's duty to the principal prohibits him from using his employer's trade secrets after the employment relationship ends. *See* Restatement (Second) of Agency § 396 (1958).

In *Potts,* we held that an employee has a fiduciary duty of loyalty to his employer. *Potts,* 475 N.E.2d at 713. We explained that an agent is subject to a duty to act solely for the benefit of the principal. *Id.* at 711. Thus, we concluded that an agent may not place himself in a position wherein

his own interests are potentially antagonistic to those of his principal. *Id.* Relying on our holding in *Potts* and the Restatement, we find that by appropriating Northern Electric's servo motor data for his own by refusing to return it at the end of his employment and subsequently using it to compete with the company afterwards, Torma violated his fiduciary duty to his employer. Therefore, we reverse the trial court's conclusion that Northern Electric failed to establish a breach of fiduciary duty.

### II. *Attorneys' Fees*

Lastly, Northern Electric challenges the trial court's award of attorneys' fees to Torma pursuant to I.C. § 34–52–1–1. With regard to attorneys' fees, we initially review the trial court's findings of fact under the clearly erroneous standard. *Kahn v. Cundiff,* 533 N.E.2d 164, 167 (Ind. Ct.App.1989), *aff'd,* 543 N.E.2d 627, 629 (Ind.1989). We subsequently review *de novo* the trial court's legal conclusion as to whether attorneys' fees are statutorily warranted. *Id.*

Under Indiana Code section 34–52–1–1, a court may award attorneys' fees to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

In *Kahn,* our supreme court approvingly affirmed our opinion defining the relevant statutory terms. *Kahn,* 543 N.E.2d at 629. We defined a claim or defense as frivolous (a) if it is taken primarily for the purpose of harassing or maliciously injuring a person, or (b) if the lawyer is unable

to make a good faith and rational argument on the merits of the action, or (c) if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. *Kahn,* 533 N.E.2d at 170. A claim or defense is unreasonable under the statute, if, based on a totality of the circumstances, including the law and the facts known at the time of the filing, no reasonable attorney would consider that the claim or defense was worthy of justification. *Id.* at 170–71. Finally, we determined a claim or defense to be groundless if no facts exist which support the legal claim relied on and presented by the losing party. *Id.* Furthermore, we held that a claim or defense is neither groundless nor frivolous merely because a party loses on the merits. *Id.* at 171.

Analyzing the purpose of Indiana Code section 34–52–1–1, our supreme court first noted that the statute strikes a balance between respect for an attorney's duty of zealous advocacy and "the important policy of discouraging unnecessary and unwarranted litigation." *Mitchell v. Mitchell,* 695 N.E.2d 920, 924 (Ind.1998) (quoting *Kahn,* 533 N.E.2d at 170). The court observed further that the legal process must invite, not inhibit the presentation of new and creative arguments to enable the law to grow and evolve. Therefore, the *Mitchell* court concluded that application of the statutory authorization for recovery of attorneys' fees under Indiana Code section 34–52–1–1 must leave breathing room for zealous advocacy and access to the courts to vindicate rights. *Id.*

■ Here, after conducting a special hearing on the issue of attorneys' fees, the trial court ordered, in pertinent part:

[w]hile the [c]ourt recognizes that the question of the ownership of the data compilation in question may be a novel question of law, the question of who owned this compilation was secondary to the question of whether these data or their compilation were trade secrets. In order to qualify as a trade secret, the data compilation must be shown to have been the "subject of efforts that were reasonable under the circumstances to maintain its secrecy." Based upon the totality of the evidence, including the alleged value of the data compilation and the lack of virtually any efforts to protect its privacy, including the failure to even seek its "return" upon Torma's departure from [Northern Electric], the evidence fails to support a determination that [Northern Electric] [ ] undertook reasonable efforts to maintain the secrecy of the data or the data compilation. A dispassionate consideration by [Northern Electric] of the evidence supporting its claim that it took reasonable efforts to maintain the secrecy of the data or their compilation would have resulted in the conclusion that proceeding to trial on its claim was not justified.

(Appellant's App. pp. 16–7).

■ Initially, we acknowledge that the trial court, prior to hearing the case on its merits, decided that a temporary injunction was justified. Specifically, on July 15, 2002, the trial court ordered Torma to return all prototypes obtained by him while in Northern Electric's employment, to provide Northern Electric with a copy of all servo motor specifications developed while employed and to keep complete records as to any use of these specifications by him and any economic advantage he derives from such use. We note that a party seeking a preliminary injunction must demonstrate, *inter alia,* that there is a reasonable likelihood of success at trial by establishing a *prima facie* case. *See Davis v. Sponhauer,* 574 N.E.2d 292, 302 (Ind.Ct.App.1991). Thus, the trial court, by granting the preliminary injunction, ef-

**432**

fectively held that Northern Electric had established a *prima facie* case, with a reasonable likelihood of success at trial. Therefore, by now stating in its Order for Attorneys' Fees that "a dispassionate consideration [ ] of the evidence [ ] would have resulted in the conclusion that proceeding to trial on its claim was not justified," the trial court contradicts its earlier grant of preliminary injunction. (Appellant's App. p. 17).

Moreover, we find that the most Northern Electric can be accused of here is zealous advocacy. *See Mitchell*, 695 N.E.2d at 924. Our review of the trial court's proceedings and the party's briefs reveal a well-argued and supported argument on the merits. Even though some issues are new to this jurisdiction, this alone should not preclude a party's unbridled access to the courts and expose it to sanctions; instead, it should be lauded by the courts as a way for Indiana's case law to evolve. *See id.* Thus, as evidenced by our reversal of the trial court's conclusions on the merits of the case, we disagree with the trial court's assessment of a complete lack of reasonable efforts on the part of Northern Electric to secure the secrecy of its trade secret. Therefore, considering the totality of the circumstances, including the law and facts known at the time of filing this action, a reasonable attorney could well have found Northern Electric's claim worthy of defending. *See* I.C. § 34–52–1–1. Accordingly, we reverse the trial court's award of attorneys' fees.

### CONCLUSION

Based on the foregoing, we find that the trial court erred as a matter of law by concluding that (1) Torma, assigned to repair servo motors by Northern Electric, owns the data generated in the course of his duties and compiled in a useable format on his home computer; (2) the compi-

lation of data is not entitled to trade secret protection under IUTSA; (3) Torma did not commit criminal conversion within the meaning of the Victim's Relief Act, Ind. Code § 34–24–3–1; (4) Torma did not breach his fiduciary duty to Northern Electric; and (5) Torma is entitled to attorneys' fees pursuant to I.C. § 34–52–1–1. Consequently, we reverse the trial court's Findings of Fact and Conclusions of Law.

Reversed.

CRONE, J., and VAIDIK, J., concur.