# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1905

_____

Hallmark Cards, Incorporated

*Plaintiff - Appellee*

v.

Monitor Clipper Partners, LLC

*Defendant - Appellant*

Monitor Clipper Equity Partners, II, LP; Monitor Company Group Limited
Partnership; Mark Pocharski; Robert Lurie; Adam Doctoroff; Steven Levin;
Annica Blake; Robert Samuelson; RPG Investment Holdings, LLC; Charles Yoon;
William Young; Mark Thomas; Sullivan & Worcester, LLP; Laura Steinberg;
Rouse Hendricks German May, PC; Stinson Morrison Hecker, LLP

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 14, 2014
Filed: July 15, 2014

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge

Hallmark Cards, Inc. (Hallmark), hired Monitor Company Group, L.P. (Monitor), to compile research on the greeting cards market. Monitor transmitted confidential market research it had prepared for Hallmark to a private equity firm called Monitor Clipper Partners, LLC (Clipper), the defendant in this litigation. Clipper used this information to purchase and subsequently manage a competitor of Hallmark's called Recycled Paper Greetings, Inc. (RPG). Hallmark sued Monitor for breaching its contractual obligations and Clipper for misappropriating Hallmark's trade secrets in violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450 *et seq.* (MUTSA). Hallmark settled with Monitor for $16.6 million; its case against Clipper proceeded to trial, where a jury awarded Hallmark $21.3 million in compensatory damages and $10 million in punitive damages. After the verdict, Clipper moved for judgment as a matter of law and alternatively to alter or amend the judgment, asserting (1) that the evidence did not support the verdict, (2) that the jury award gave Hallmark a double recovery because Hallmark had already settled with Monitor for the same injury, and (3) that the assessment of punitive damages against Clipper violated Missouri law and the Due Process Clause of the Constitution. The district court[1] denied these motions, and we affirm.

I.

Hallmark is a manufacturer of greeting cards headquartered in Kansas City, Missouri. In December 2001, Hallmark retained Monitor, a Boston-based consulting firm, to research consumer behavior in the greeting cards market. Monitor created a "case team" of consultants dedicated to the project, and the team set itself to the task and created a series of PowerPoint presentations containing its findings. Hallmark and Monitor signed several confidentiality agreements preventing Monitor from sharing these findings with anyone else.

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

Monitor was closely affiliated with Clipper, a private equity firm founded by two of Monitor's original partners and headquartered in Monitor's building.[2]  A team of Monitor consultants served Clipper exclusively, and Clipper's investing strategy was explicitly predicated on harnessing Monitor's network of consulting clients. Clipper referred to Monitor as its "consulting arm" and attracted investors by touting its "privileged access to the proprietary resources of [Monitor]" and its "substantial number of potential investments through Monitor's business relationships and through initiatives and target industries where Monitor has significant knowledge and expertise."

Perhaps not coincidentally, shortly after Hallmark hired Monitor, Clipper became interested in acquiring RPG, a greeting cards manufacturer that was up for auction.  Clipper asked several Monitor consultants on the Hallmark case team to provide research on the greeting cards market that the team had compiled during its work for Hallmark.  These consultants provided Clipper with five PowerPoint presentations that Monitor had prepared for Hallmark.  Clipper used the information contained in these presentations to price its bid for RPG and then to obtain financing for its bid, telling potential investors that "through [Monitor's] unparalleled experience in the greeting cards industry including the work they have done with Hallmark, [Clipper] can derive growth and produce high cash flow from RPG that others cannot."  Clipper ultimately won the auction for RPG.

After Clipper announced its purchase, Hallmark began to suspect that Monitor had disclosed some of Hallmark's proprietary research to Clipper.  Both Monitor and Clipper denied any wrongdoing.  Hallmark nevertheless asked both companies to institute litigation holds on all materials related to Clipper's acquisition of RPG. Instead of complying with this request, Monitor and Clipper began systematically to

---

[2]We use the past tense here because Monitor filed for bankruptcy in 2012 and was purchased by Deloitte Touche Tohmatsu, Ltd., in January of 2013.

destroy evidence documenting their transactions, erasing hard drives containing Hallmark's proprietary information while continuing to represent to Hallmark that Clipper had never possessed this information.

Hallmark remained unconvinced. It initiated an arbitration proceeding against Monitor in 2006, alleging that Monitor had transmitted Hallmark's trade secrets to Clipper in violation of both Monitor's confidentiality agreements and MUTSA. Because Monitor and Clipper had so thoroughly erased the evidence of their transactions, Hallmark had scant evidence to support its claims. The arbitrator ultimately ruled for Hallmark on its breach-of-contract claim and against Hallmark on its MUTSA claim. In particular, the arbitrator found that Monitor had used Hallmark's information "carelessly, although without bad motive" by disseminating Hallmark's information widely within Monitor, including to employees who were not on the Hallmark case team, but that Monitor had never intentionally disclosed Hallmark's PowerPoint presentations to anyone outside the company. The arbitrator further concluded that any compromise of Hallmark's proprietary information had been limited to one PowerPoint presentation, the "Greetings" project. The arbitrator awarded Hallmark $4.1 million in damages, which consisted of the $3.2 million fee Hallmark had paid Monitor for the Greetings project and $900,000 to account for the possibility that Hallmark's other trade secrets might be compromised in the future as a result of Monitor's breach. The arbitrator also instructed Monitor to retain an independent forensic investigator to search its computer logs for any of Hallmark's proprietary information, report any such information to Monitor and Hallmark, and then delete that information.

In 2008, this search turned up two e-mails containing a total of five PowerPoint presentations that Monitor had originally prepared for Hallmark. These e-mails had been sent from Monitor consultants on the Hallmark case team to their counterparts on the Clipper case team, and they established that Monitor had willfully provided Hallmark's proprietary research to Clipper at Clipper's request. Hallmark petitioned

the district court to reopen the arbitration proceeding, and the district court granted the petition, leaving the arbitrator's original $4.1 million award intact pending further arbitration. Hallmark and Monitor eventually settled the reopened dispute for an additional $12.5 million, for a total of $16.6 million. The settlement stated that it was "attributable to damages related to the breach of contract claims asserted in the Re-Opened Arbitration and to interest, expenses, and attorney's fees."

Hallmark then sued Clipper in federal court, alleging that Clipper had misappropriated Hallmark's trade secrets to acquire and manage RPG in violation of MUTSA. A jury agreed with Hallmark and awarded it $21.3 million in compensatory damages and $10 million in punitive damages. After the verdict, Clipper moved for judgment as a matter of law, asserting that the jury lacked sufficient evidence from which to conclude that Hallmark's PowerPoint presentations constituted trade secrets under MUTSA, that the verdict gave Hallmark a second recovery for a single injury, and that the punitive damages assessed against Clipper were inconsistent with Missouri law and due process. After the court denied that motion, Clipper moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), asserting that under Missouri's settlement offset statute, see Mo. Rev. Stat. § 537.060, the jury verdict should be offset by the amount of Hallmark's settlement with Monitor. The district court denied that motion as well, and Clipper appealed both post-verdict rulings.

II.

The parties present three issues on appeal: first, whether the jury correctly found that Hallmark's PowerPoint presentations constituted trade secrets under MUTSA; second, whether the jury verdict gave Hallmark a double recovery; and third, whether the imposition of punitive damages against Clipper is permissible under Missouri law and the Due Process Clause.

A.

We begin with Clipper's argument that the jury lacked sufficient evidence to conclude that Hallmark's PowerPoint presentations constituted "trade secrets" under MUTSA. In assessing a challenge to the sufficiency of evidence submitted to a jury, we "must affirm the jury's verdict unless, after viewing the evidence in the light most favorable to [Hallmark], we conclude that no reasonable jury could have found in [its] favor." Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir. 2008) (quoting Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir. 2002)).

MUTSA defines a trade secret as:

[I]nformation, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4). Clipper asserts that Hallmark's PowerPoint presentations fail both prongs of this definition. First, Clipper argues that the presentations were not "the subject of efforts . . . to maintain [their] secrecy" because Hallmark published the central conclusions of the presentations before Clipper acquired them. Second, Clipper asserts that the information contained in the presentations had grown "stale" in the four years between Monitor's creation of the presentations and Clipper's acquisition of them, which is another way of saying that the presentations no longer "[d]erive[d] independent economic value . . . from not

-6-

being generally known to" the public.  See UTStarcom, Inc. v. Starent Networks, Corp., 675 F. Supp. 2d 854, 871 (N.D. Ill. 2009); Carboline Co. v. Lebeck, 990 F. Supp. 762, 767 (E.D. Mo. 1997).

We find neither argument persuasive.  Hallmark did publish some general conclusions about the greeting cards market based on information contained in its PowerPoint presentations, but these conclusions never went beyond broad generalities.  At a meeting of the Greeting Card Association in the early 2000s, for instance, Hallmark disclosed that women over forty-five were turning to "alternative forms of communication" to express sentiments that they had once expressed through cards.  But Hallmark did not publish any of the evidence supporting the conclusion or explain how it had reached this conclusion.  This unpublished evidence might have led another company to reach a different conclusion about women over forty-five, or perhaps that company would have used that evidence to answer a different question entirely.  The value of this evidence, therefore, depends on far more than the broad conclusions that Hallmark drew from the data.  See AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 972 (8th Cir. 2011) ("Th[e] value [of a trade secret] is not dependent on how much of the information is otherwise unavailable because 'the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known.'" (quoting N. Elec. Co. v. Torma, 918 N.E.2d 417, 426 (Ill. Ct. App. 2004))).

Nor did the passage of four years deprive the PowerPoint presentations of their economic value.  The record discloses that Clipper found information about the greeting cards market to be "sparse" in 2005, when it acquired the presentations.  While the economic value of the presentations may have diminished in the four years prior to Clipper's misappropriation, the paucity of other information available meant that the presentations still provided a valuable source of knowledge about the greeting cards market.

We thus conclude that the jury had sufficient evidence before it to find that Hallmark's PowerPoint presentations constituted trade secrets under MUTSA.

B.

Clipper next contends that the jury verdict gave Hallmark a second recovery for a single injury, because Hallmark had already settled a similar claim against Monitor. Clipper asserts that this double recovery requires either that we set aside the entire jury verdict or that we reduce the verdict by the amount of Hallmark's settlement with Monitor, see Mo. Rev. Stat. § 537.060. We conclude that Hallmark's settlement with Monitor and its jury verdict against Clipper compensated Hallmark for independent injuries and that no reduction of the jury award is necessary.

"It is a well-settled rule in Missouri that a party cannot be compensated for the same injury twice." Norber v. Marcotte, 134 S.W.3d 651, 661 (Mo. Ct. App. 2004). Clipper asserts that the two wrongful acts involved in the transaction between Monitor and Clipper—Monitor's transmission of Hallmark's trade secrets to Clipper, and Clipper's receipt of those same trade secrets—gave rise to a single injury. As Clipper points out, we held in Kforce, Inc. v. Surrex Solutions Corp., 436 F.3d 981, 984 (8th Cir. 2006), that the transmission of trade secrets between two potential defendants creates a single injury, and a plaintiff may not seek damages both for the dissemination of its trade secrets and for the concomitant acquisition of those trade secrets in the same transaction.

But Hallmark's injuries were not limited to a single transaction; rather, as we explain below, Hallmark's settlement with Monitor compensated Hallmark for the transmission of its trade secrets from Monitor to Clipper, while Hallmark's jury verdict against Clipper compensated Hallmark for Clipper's subsequent use of those trade secrets to acquire and manage RPG. These two acts caused two distinct injuries, and Hallmark is entitled to compensation for both.

1.

The first of these injuries arose when Monitor transmitted Hallmark's trade secrets to Clipper. Hallmark recovered a total of $16.6 million for this injury from Monitor—$4.1 million from an arbitration award and $12.5 million from a settlement after Hallmark discovered Monitor's fraud and the court re-opened the arbitration. Both of these awards were, by their very terms, attributable exclusively to Monitor's breach of its confidentiality agreement: the arbitrator explicitly ruled against Hallmark on every claim except for breach of contract, and the settlement stated that it was attributable "to damages related to the breach of contract claims asserted in the Re-Opened Arbitration and to interest, expenses, and attorney's fees."

A defendant that breaches a contract is, of course, normally liable for the natural consequences of that breach, Cason v. King, 327 S.W.3d 543, 553 (Mo. Ct. App. 2010), and Clipper's use of Hallmark's trade secrets was arguably a natural consequence of Monitor's transmission of Hallmark's trade secrets. But neither the arbitration award nor the settlement could have compensated Hallmark for Clipper's use of Hallmark's trade secrets, because Hallmark and Monitor specified in their contracts that "[n]either Monitor nor Hallmark shall in any circumstances be liable to the other for any incidental, consequential, special, multiple, or punitive damages." Because both the settlement and the arbitration award were based on this contract, and the contract expressly disclaimed consequential damages, neither the settlement nor the arbitration award is fairly attributable to the indirect consequences of Monitor's breach, including Clipper's use of Hallmark's trade secrets.

2.

By contrast, Hallmark's jury verdict against Clipper compensated Hallmark only for Clipper's use of its trade secrets, not for Clipper's acquisition of those trade

secrets from Monitor. Hallmark brought its lawsuit under MUTSA, which defines misappropriation as

(a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:

a. Used improper means to acquire knowledge of the trade secret; or

b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

Mo. Rev. Stat. § 417.453. This definition encompasses both the acquisition of a trade secret and the subsequent use of that trade secret by the acquirer. Whether a lawsuit seeks recovery for one injury or the other, therefore, is a question that must be answered by looking at the posture of each specific case.

As the record makes clear, Clipper's liability was predicated exclusively on its use of Hallmark's trade secrets, not on its acquisition of those secrets. Jury Instruction No. 20, the only jury instruction that relates to liability, instructs the jury to find for Hallmark only if:

1. The defendant used any of the plaintiff's trade secrets you found to exist under Instruction No. 19 and, before materially changing his or its position, the defendant had reason to know

    a. The information was plaintiff's trade secret, and

    b. The trade secret had been acquired by accident or mistake; or

2. The defendant used any of the plaintiff's trade secrets you found to exist under Instruction No. 19 and knew or had reason to know that the information had been acquired from another person or entity who owed a duty to the plaintiff to maintain secrecy.

Instruction No. 20 makes liability contingent solely on Clipper's use of Hallmark's trade secrets; Clipper's acquisition of these secrets, standing alone, does not itself give rise to liability. This instruction also explicitly parallels the second section of MUTSA's definition of misappropriation, which makes it a tort to "[d]isclos[e] or use" a trade secret. Because liability in Hallmark's lawsuit against Clipper was predicated entirely on Clipper's use of Hallmark's trade secrets, Hallmark's recovery in the lawsuit is attributable to nothing else.

The damages in this case also depended exclusively on Clipper's use of Hallmark's trade secrets. The court presented the jury with two damage calculations, one based on unjust enrichment and the other based on a reasonable royalty.[3] The unjust enrichment calculation measured the actual amount of money that Clipper had saved by using Hallmark's proprietary information instead of commissioning its own research, and the reasonable royalty measured the amount that Clipper would have likely paid Hallmark for the use of Hallmark's proprietary information. The royalty

---

[3]The jury calculated damages under both rubrics, and Hallmark elected to recover the larger of the two amounts.

was calculated using a discounted cash flow analysis, which estimated the profits that Clipper expected to earn from acquiring, managing, and ultimately selling RPG. Both of these calculations depend on Clipper's actual use of Hallmark's trade secrets: had Clipper merely acquired Hallmark's trade secrets for its own edification, both of the above damage calculations would have fallen to zero.

Thus, both the determination of liability and the assessment of damages in this case depend crucially on Clipper's use of Hallmark's trade secrets. Clipper's acquisition of those trade secrets, while antecedent to Clipper's use of Hallmark's trade secrets, did not account for any portion of Hallmark's recovery.

This is not to say that Clipper's acquisition of Hallmark's trade secrets was wholly irrelevant at trial. Clipper's deceit in acquiring the trade secrets supported the jury's award of punitive damages[4] and was part of the narrative that Hallmark sought to tell the jury. Just as a prosecutor might explain to a jury how a criminal defendant arrived at the scene of a crime, Hallmark was within its rights to describe to the court and to the jury exactly how Clipper came to be in possession of its trade secrets. Such a description may be relevant, even if it does not itself give rise to liability, as long as it "forms an integral and natural part of an account of the [tort], or is necessary to complete the story of the [tort] for the jury." United States v. Troya, 733 F.3d 1125, 1131 (11th Cir. 2013) (quoting United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007)); see also United States v. Ruiz-Chavez, 612 F.3d 983, 988 (8th Cir. 2010). Hallmark's references to Clipper's acquisition of its trade secrets in the pleadings and at trial, therefore, do not establish that Hallmark sought or received

---

[4]Punitive damages could only have been assessed against Clipper, since Monitor and Hallmark disclaimed punitive damages in their contracts. Because Hallmark could have recovered punitive damages from only one defendant, we need not be concerned that the award gave Hallmark a double recovery on that aspect of its claim against Clipper.

compensation for Clipper's acquisition of its trade secrets; indeed, both the jury instructions and damage calculations indicate that it received no such compensation.

C.

Finally, Clipper asserts that the assessment of punitive damages against it violated Missouri law and the Due Process Clause. We review for abuse of discretion the district court's conclusion that the jury's award of punitive damages comported with state law, Parsons v. First Investors Corp., 122 F.3d 525, 529 (8th Cir. 1997), and we review the constitutionality of that award *de novo*. MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 932 (8th Cir. 2004). We conclude that punitive damages were appropriate under both standards.

1.

Under Missouri law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. 1989) (en banc) (quoting Restatement (Second) of Torts § 908(2)). As the Missouri Court of Appeals recently explained in Drury v. Missouri Youth Soccer Association,

> The necessary mental state is found when a person intentionally does a wrongful act without just cause or excuse. When someone intentionally commits a wrong and knew that it was wrong at the time, an evil motive and wanton behavior is exhibited. An evil intent may also be inferred where a person recklessly disregards the rights and interests of another person.

259 S.W.3d 558, 573 (Mo. Ct. App. 2008) (citations omitted). The plaintiff must establish by clear and convincing evidence that the defendant possessed such a mental state. Id.

-13-

The district court did not abuse its discretion in concluding that Hallmark had met this burden, for the record discloses Clipper's numerous attempts to conceal its misappropriation of the Hallmark's trade secrets. Clipper ignored numerous litigation holds, destroyed records, erased computers, and generally sought to avoid liability for its wrongdoing in whatever way it could. This massive cover-up demonstrates, at the very least, that Clipper acted in reckless disregard of the rights of Hallmark, which suffices under Missouri law to support an award of punitive damages.

2.

Nor do we find the amount of punitive damages in this case "grossly excessive" such that their assessment violates due process. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 434 (2001). "[P]unitive damages are grossly excessive if they 'shock the conscience of this court or . . . demonstrate passion or prejudice on the part of the trier of fact.'" Ondrisek v. Hoffman, 698 F.3d 1020, 1028 (8th Cir. 2012) (quoting Stogsdill v. Healthmark Partners, L.L.C., 377 F.3d 827, 832 (8th Cir. 2004)) (alteration in original). In determining whether a punitive damages award comports with due process, we consider "the degree of reprehensibility of the [the defendant's conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996).

The district court observed that "the reprehensibility [of Clipper's conduct] is not as high as might exist in other cases." See D. Ct. Order of Mar. 20, 2013, at 11. In assessing reprehensibility, we consider (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of

intentional malice, trickery, or deceit, or mere accident.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

Only the last two factors are implicated here:  Clipper's actions did not endanger anyone's physical health or safety, and Hallmark is not financially vulnerable.  But Clipper's conduct did involve repeated attempts to conceal its tortious conduct, and the harm that befell Hallmark resulted from malice, trickery, and deceit.  We have previously held that evidence of such deceit by itself can support a punitive damages award, as long as that award remains proportionate to the reprehensibility of the defendant's conduct.  See Trickey v. Kaman Indus. Tech. Corp., 705 F.3d 788, 803 (8th Cir. 2013).  Considering the extensive measures Clipper took to conceal its wrongdoing from both Hallmark and the court, we conclude that Clipper's conduct was sufficiently reprehensible to support at least a modest award of punitive damages.

The second two Gore guideposts—the magnitude of punitive damages relative to the plaintiff's harm, and the magnitude of punitive damages awards imposed in similar cases—establish that the award in this case was modest enough to comport with due process.  The punitive damages award was roughly half of Hallmark's compensatory damages award, and the compensatory damages might have been far higher (and the relative size of the punitive damages award far lower) had Clipper succeeded in turning RPG into a legitimate competitor of Hallmark's (instead, RPG filed for bankruptcy in 2009).  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.").  The Supreme Court has "repeatedly intimated that a four-to-one ratio [of punitive damages to compensatory damages] is likely to survive any due process challenges given the historic use of double, treble, and quadruple damages," Wallace v. DTG Operations, Inc., 563 F.3d

357, 363 (8th Cir. 2009) (citing Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991)), and comparable cases from our circuit have involved punitive damage awards that are double the compensatory damage award. See, e.g., Conseco Fin. Servicing Corp. v. N. Am. Mort. Co., 381 F.3d 811, 824-25 (8th Cir. 2004). Given the relatively small size of the punitive damages award in this case, we conclude that the award was not grossly excessive under the Due Process Clause.

III.

The judgment is affirmed.

_____